## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS/SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **THOMAS PAUL CALDWELL and** | § | |
| **JOSHUA JAYME OLIVAREZ** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | **Civil Action No. 5:26-cv-2527** |
| **AUDREY GOSSETT LOUIS,** | § | |
| **Individually;** | § | |
| **JENNIFER THARP, Individually and** | § | |
| **in her Official Capacity;** | § | |
| **JAMES STEWART, Individually** | § | **COMPLAINT** |
| **and in his Official Capacity as Sheriff** | § | |
| **of Wilson County, Texas;** | § | |
| **SAMMY MARK McCRARY,** | § | |
| **Individually;** | § | **Jury Trial Demanded** |
| **JESSICA FRAZIER, Individually;** | § | |
| **GREGORY DICKERMAN,** | § | |
| **Individually;** | § | |
| **CLINTON GARZA, Individually;** | § | |
| **JOSEPH DUBS, Individually;** | § | |
| **COMAL COUNTY, TEXAS; and** | § | |
| **WILSON COUNTY, TEXAS,** | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT AND JURY DEMAND

**HERE COMES** Plaintiffs Thomas Paul Caldwell and Joshua Jayme Olivarez files

this Complaint and Jury Demand under 42 U.S.C. § 1983 and alleges as follows:

## SECTION I — INTRODUCTION

1.     This case is not about a prosecution. It is about what government actors from

numerous agencies did to fabricate one.

2.      It is about what prosecutors did after they concluded they couldn't convict, but were determined to see that justice was done; by any means necessary.

3.      It is about what government actors did when they chose to operate without the safeguards the Constitution requires to silence fellow prosecutors and police officers.

4.      Plaintiffs Thomas Caldwell and Joshua Olivarez were never given any meaningful opportunity to challenge the criminal accusations Defendants generated and circulated about them.

5.      What began in June 2023 as reports of misconduct within the Wilson County Sheriff's Office was redirected into a coordinated effort to discredit the individuals reporting it.

6.      That effort moved through multiple layers of government, including Wilson County officials, the Office of the Attorney General, and the Comal County Criminal District Attorney's Office.

7.      Defendants did not follow the ordinary course of a criminal case. They did not obtain indictments. They did not submit their accusations through the system for adversarial testing. They did not secure judicial review of the allegations they later published.

8.  Instead, Defendants used grand jury investigative authority, selective evidence gathering and review, false or misleading statements, and coordinated publication to construct a criminal narrative against Plaintiffs.

9.  That narrative was ultimately formalized in documents styled and circulated as though they were the output of a legitimate prosecutorial process, even though no such criminal case existed.

10.  Those materials were then transmitted to courts, agencies, employers, and disciplinary authorities so that Plaintiffs would suffer the consequences of criminal accusation without the ability to avail themselves of the Constitutional protections that accompany prosecution.

11.  This action seeks relief under 42 U.S.C. § 1983 for retaliation, fabrication of evidence, deprivation of liberty, denial of due process, stigma-plus injury, conspiracy, and municipal liability arising from that conduct.

12.  True and correct copies of selected documents central to Plaintiffs' claims are attached as exhibits. Additional materials referenced herein are in Plaintiffs' possession and will be produced in discovery.

## SECTION II — PARTIES

13.  Plaintiff Thomas Paul Caldwell is an individual and a resident of Texas.

14. Caldwell served as the elected County Attorney of Wilson County, Texas through December 31, 2024.

15. At all relevant times during the publication, dissemination, and resulting harm caused by the conduct described in this Complaint, Caldwell was no longer a county official and was acting as a private citizen.

16. Plaintiff Joshua Jayme Olivarez is an individual and a resident of Texas.

17. At all relevant times, Olivarez was employed as an investigator in the Wilson County Attorney's Office through December 31, 2024, and thereafter accepted employment with the Bee County Sheriff's Office where he was employed from January 1, 2025 until January 17, 2025.

18. Defendant Audrey Gossett Louis is an individual who, at all relevant times, was a licensed attorney in Texas, and is the elected District Attorney for the 81st Judicial District of Texas. She is sued in her individual capacity. She may be served at 1105 A Street, Floresville, Texas 78114 or wherever she may be found.

19. Defendant Jennifer Tharp is an individual who, at all relevant times, was a licensed attorney in Texas, and was the Criminal District Attorney of Comal County, Texas and the court-appointed special prosecutor in the matter described herein. She is sued in her individual and official capacities. She

may be served at 199 Main Plaza, Suite 2007, New Braunfels, TX 78130 or wherever she may be found.

20. Defendant Jessica Frazier is an individual who, at all relevant times, was a licensed attorney in Texas, and was a prosecutor employed by the Comal County Criminal District Attorney's Office. She is sued in her individual capacity. She may be served at 199 Main Plaza, Suite 2007, New Braunfels, TX 78130 or wherever she may be found.

21. Defendant Sammy Mark McCrary is an individual who, at all relevant times, was a licensed attorney in Texas, and was a prosecutor employed by the Comal County Criminal District Attorney's Office. He is sued in his individual capacity. He may be served at 199 Main Plaza, Suite 2007, New Braunfels, TX 78130 or wherever he may be found.

22. Defendant James Stewart is an individual who, at all relevant times, was employed as a peace officer and was the elected Sheriff of Wilson County, Texas. He is sued in his individual and official capacities. He may be served at 800 10th Street, Unit 2, Floresville, TX 78114 or wherever he may be found.

23. Defendant Clinton Garza is an individual who, at all relevant times, was employed as a peace officer, and was the Chief Deputy of the Wilson County

Sheriff's Office. He is sued in his individual capacity.  He may be served at 800 10th Street, Unit 2, Floresville, TX 78114 or wherever he may be found.

24.  Defendant Joseph Dubs is an individual who, at all relevant times, was employed as a peace officer and was the Lieutenant who supervised the Criminal Investigations Division of the Wilson County Sheriff's Office. He is sued in his individual capacity.  He may be served at 800 10th Street, Unit 2, Floresville, TX 78114 or wherever he may be found.

25.  Defendant Gregory Todd Dickerman is an individual who, at all relevant times, was employed as a peace officer and acted under authority asserted through the Texas Office of the Attorney General in connection with the matters described herein. He is sued in his individual capacity.  He may be served at the Texas Office Of Attorney General, 300 W. 15th Street Austin, Texas 78701 or wherever he may be found.

26.  Defendant Wilson County, Texas is a local governmental entity subject to suit under 42 U.S.C. § 1983.  It may be served by and through its chief executive, Wilson County Judge Henry Whitman.  He may be served at 1420 3rd St Ste 101, Floresville Texas 78114.

27.  Defendant Comal County, Texas is a local governmental entity subject to suit under 42 U.S.C. § 1983.  It may be served by and through its chief

executive, Comal County Judge Kristen Hoyt. She may be served at 100 Main Plaza, New Braunfels, TX 78130.

28. At all relevant times, each individual Defendant acted under color of state law.

29. Defendant Stewart acted as a final policymaker for Wilson County with respect to law-enforcement operations, internal investigative responses, information control, and related matters within the Wilson County Sheriff's Office.  This authority is derived from state statute.

30. Defendant Tharp exercised final decision-making authority, at minimum, with respect to the creation, approval, and dissemination of the accusatory materials issued and circulated through Comal County as alleged in this Complaint.  This authority is derived from state statutes.

## SECTION III — JURISDICTION AND VENUE

31. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

32. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and § 1343 because Plaintiffs seek redress for the deprivation, under color of state law, of rights secured by the Constitution of the United States.

33.    Plaintiffs assert claims under the First, Fourth, and Fourteenth Amendments, including retaliation for protected speech and petitioning activity, fabrication-based deprivation of liberty, stigma-plus injury, denial of procedural due process, conspiracy, and municipal liability.

34.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

35.    The underlying misconduct was reported in Wilson County, the retaliatory and coordinated conduct began in Wilson County, and substantial resulting harm was directed into and suffered within this District.

36.    Venue is also proper because multiple Defendants reside in this District, including Stewart, Garza, and Dubs.

37.    This Court has personal jurisdiction over each Defendant because each Defendant purposefully directed conduct while in Texas and toward Plaintiffs in Texas, and the claims arise out of that conduct.

### SECTION IV — FACTUAL BACKGROUND

**A.  The Events from June 2023**

38. By June 2023, Plaintiff Thomas Caldwell had been the elected Wilson County Attorney for seven years, and Plaintiff Joshua Olivarez had served as the Chief Investigator in that office for over six years.

39. The Wilson County Attorney's Office is the chief prosecutor for all offenses heard at the County Court and lower levels, and also performs other roles, such as providing protective orders, and civil guidance and representation to Wilson County. At the time these events substantially occurred, the agency was fully accredited by the Texas Commission on Law Enforcement, and was staffed by two full time peace officers with arrest powers, Plaintiff Olivarez and Dwayne Mercer.

40. Before June 2023, Caldwell's office had already received multiple complaints concerning misconduct within the 81st Judicial District Attorneys Office, including complaints tied directly or indirectly to Defendant Audrey Gossett Louis.

41. The complaints ranged from assisting others to access private cell phone information without a warrant or subpoena, direct involvement in criminal investigations in which a case had not been submitted to her office, and misuse of official information she or her employees had access to by virtue of their office or employment.

42.  Before June 2023, Caldwell's office had already received multiple complaints concerning misconduct within the Wilson County Sheriff's Office, including complaints tied directly or indirectly to Defendants Joseph Dubs and/or Clinton Garza.

43.  The complaints ranged from unnecessary use of force, to untruthfulness in investigations, accessing private cell phone information without a warrant or subpoena, and misuse of official information they had access to by virtue of their office or employment.

44.  The available records reflected repeated instances in which Louis, Dubs or others would be involved in an incident, but their roles would be minimized, omitted, or shifted onto others in the paperwork, including through reports prepared by other personnel.

45.  Caldwell's office had also identified separate patterns involving misuse of confidential information, deviations from ordinary practices for obtaining or disclosing information, and stiff resistance by senior Sheriff's Office personnel when questioned about internal conduct dating back to 2021 when Stewart first took office.

46.  Defendant James Stewart was the elected Sheriff of Wilson County and the final policymaker for the Sheriff's Office.  He had been the Sheriff for approximately two years.  Prior to being elected in 2020, the great extent of

Stewart's law enforcement experience was as a Texas Highway Patrol Sergeant, for the Texas Department of Public Safety.

47.    Defendant Clinton Garza was Stewart's second-in-command and exercised substantial supervisory authority within the agency. He had started in this role when Stewart took office. He also had came from a different agency.

48.    Defendant Audrey Gossett Louis was the elected District Attorney for the 81st Judicial District and, by the summer of 2023, was already a known point of concern to Caldwell because of prior matters involving her or her staff and misuse of information, and deviations from formal practices, and her refusal to engage when those issues were raised with her.

49.    In May 2023, in response to rumors he was in some manner involved in a federal lawsuit that had been filed against her, Caldwell sent Louis materials previously provided to the Texas Rangers concerning a complaint his office had received concerning her actions and his assurance that he was not involved.   Louis did not acknowledge the materials or engage with Caldwell about them.  On information and belief, based upon information that later came to light, Louis already had been provided these documents by the Texas Rangers and had a close relationship with several Rangers.

50.    On June 6, 2023, an individual was arrested on a warrant obtained through the Wilson County Attorney's Office for a case that had been referred there

from the Texas Ethics Commission. Very shortly after that arrest, questions arose about what had actually occurred during the service, surrender, booking, and documentation process.

51.    On June 9, 2023, a magistrate complaint received by Caldwell brought those issues into focus. The available records reflected what appeared to be a routine custodial process, including time calculations and jail-credit implications that suggested normal intake and confinement.

52.    On June 10, 2023, Olivarez requested additional records and body-camera material concerning the arrest. Dubs responded that there were no supplemental reports or body-camera materials and represented that the only law-enforcement contact connected to the event had been the involvement of another officer in fingerprinting.

53.    That response was significant because it minimized Dubs's own role and fit the same broader pattern Caldwell's office had already been seeing: Dubs's involvement existed in fact, but not in the way the official narrative presented it.

54.    On June 12, 2023, a sworn statement from the magistrate who had participated in the abbreviated booking of the individual contradicted the records and contradicted the understanding created by Dubs's response.

55.   By that point, the evidence suggested that Caldwell's office was not dealing with a mere technical discrepancy.  It was dealing with apparent falsehoods, booking records that appeared fraudulent on their face, and conduct that potentially required immediate scrutiny.

56.   Then on June 14, 2023, Wilson County's Human Resources Administrator received an after-hours complaint from a female employee of the Wilson County Sheriff's Office speaking both for herself and for another female employee who was afraid to come forward.  That complaint was not isolated.  It was one of what soon would become six different complaints involving allegations of sexual harassment, retaliation, concealment, and the failure of Sheriff's Office leadership to protect complaining employees or witnesses.

57.   One of her complaints related to inappropriate conversational subject matter and inappropriate touching, all by investigators under Dubs command.   The Administrator asked her if she had made any complaints internally and she stated she couldn't.   The employee reported that a year earlier four employees had filed statements about a sergeant.  Subsequently, these statements were released to the Sergeant by Garza.   This release had apparently caused friction between factions of employees.

58. She continued by stating the general attitude at the time was there was no point in reporting because of the way the previous matter had been handled. The arrest of Dubs had prompted the employee to reach out. She did not know why he had been arrested but assumed it might be related to how they behaved at work. So she took the chance to report out of agency.

59. The Administrator immediately notified Caldwell. By the time Caldwell learned of the situation, two of the four original female complainants had departed from the agency. The other two employees continued to work there. The following morning, Caldwell briefed the County's Chief Executive, County Judge Henry "Hank" Whitman, who agreed that the issues needed to be addressed with Stewart as soon as possible.

60. Later that day, Caldwell requested a meeting with Stewart. The meeting occurred at his office and was recorded. In that meeting, Caldwell directly informed Stewart about Dubs and the records issues, and the sexual-harassment issues that had been reported.

61. Stewart was given express notice by the elected County Attorney of criminal concerns, record discrepancies, personnel issues, and broader agency misconduct as reflected in the recorded meeting transcript. Subsequently, in statements given to investigators and other occasions, Stewart would deny

that Caldwell informed him of anything specific at the meeting. (see Exhibit 1, meeting transcript excerpts and statements)

62. On June 19, 2023, Caldwell met again with Stewart, this time with Garza present.  In that meeting, Caldwell again laid out the issues.  Although Caldwell did not fully press Garza's role in that second meeting, Garza was personally present and heard the substance of the concerns.  Subsequently, in statements given to investigators and other occasions, Garza would deny that Caldwell informed him of anything specific at the meeting.

63. By June 19, 2023, both Stewart and Garza had actual notice that serious misconduct issues were being reported and that Dubs's conduct was central to at least one of them.

64. On June 20, 2023, Caldwell sent Stewart written notice that Dubs was the subject of an active criminal investigation and requested preservation and production of records, footage, personnel materials, and statements from specific Sheriff's Office personnel.  That notice formally placed Stewart on record.

65. Despite that notice, Stewart did not act in the manner a professional law enforcement agency head would to isolate the matter.  He did not shut down outside interference or confine the response to a neutral internal process.

Instead, almost immediately after receiving notice, Stewart began conferring with Louis.

66.    That contact mattered because Louis had no legitimate or lawful reason to insert herself into what at that point, involved internal county misconduct issues and employment matters, and a developing misdemeanor criminal concern centered on WCSO personnel who had just been reported to Stewart.

67.    The evidence further reflects that, from that point forward, Stewart (and Garza) increasingly treated Louis as their sole source of guidance, despite her office having no civil authority or connection to Wilson County.   On information and belief, based upon this guidance, instead of producing evidence requested related to the situation involving Dubs promptly and transparently, Stewart resisted, stalled, and attempted to reframe the situation into the beginnings of what would become their narrative later.

68.    As the problems began to grow, in late June 2023, Caldwell attempted to meet directly with Louis.  Louis did not respond.  Her office later attempted to set something up through an assistant, but by then Caldwell had already learned enough to understand that Louis was not a neutral outsider but was already involved behind the scenes.  Knowing that Louis was involved,

Caldwell deliberately included her in subsequent email traffic concerning Dubs and related matters so that she could not later claim ignorance.

69. On June 26, 2023, Stewart demanded justification for continuing to keep Dubs on leave because he had "[. . .] not been shown anything to support misconduct." That demand came after Stewart had already been informed repeatedly of the nature of the issues and after Caldwell had already requested evidence needed to finalize the matter.

70. On June 27 and 28, 2023, after it became clear that Stewart would not address the matter internally, Caldwell's office proceeded in filing and Dubs was arrested. That arrest did not occur out of nowhere. It arose after direct notice to Stewart, direct notice to Garza, a sworn contradictory statement, unexplained record problems, and Stewart's refusal to act.

71. After Dubs arrest, he largely receded from overt official participation in matters, but only temporarily. Publicly, he remained highly critical of Caldwell during the subsequent election cycle months later. Others associated with the same narrative also attacked Caldwell publicly.

**B. Louis Interference and Narrative Crafting**

72. The same period also saw continued friction over the Sheriff's Office handling of complaints by female employees and by those perceived to be

aligned with Caldwell.  After the June meetings, Garza notified Caldwell and his staff that they were no longer to email him or other members of the Sheriff's Office directly and were instead to route communications through Stewart.  That directive centralized control in Stewart.  It also ensured that Stewart became the gatekeeper for information flowing into and out of the Sheriff's Office concerning these issues.

73.    At the same time, Stewart and Garza both worked to undermine the HR investigation related to the EEO complaints received about his office by engaging in behavior such as conducting meetings outside of their offices away from the building in the middle of summer because they told all attending staff that "the County Attorney has our offices bugged," or telling employees that the employees were under criminal investigation for something but they (Stewart and Garza) were not told what, and the employee had no choice but to participate in the interviews. These type of actions had the effect of making it very difficult for Wilson County to determine the extent of the problem at the sheriffs office or how best to educate its leadership and protect its employees.

74.    In early July 2023, because his office was the arresting agency, Caldwell recused himself and his office from prosecuting the Dubs case.  Caldwell

circulated emails about this and Brady-related concerns to relevant local agency department heads. One of which was Defendant Louis.

75.   On July 3, 2023, instead of going through Caldwell, Louis contacted the court directly wanting to be informed when a special prosecutor was appointed.  That contact was significant because it showed Louis acting in an uncharacteristic manner for something that her office was uninvolved with, while also declining to interact with Caldwell directly.

76.   On July 3 and July 11, 2023, Caldwell informed Louis and Stewart again of misconduct within Stewart's agency and Louis's lack of standing or authority. Caldwell expressly instructed Louis to stay out of matters affecting Wilson County.  Louis did not stay out of it.

77.   On July 14, 2023, additional issues surfaced when a letter from the purported victim in a different case Dubs was involved in that Louis was prosecuting was received by Caldwell's office.  This individual raised additional claims of misconduct by Dubs, Garza, and Louis herself involving the case from 2022 that they were all associated with regarding her husband, a former police officer in the County.  The facts from that case illustrated to Caldwell the broader institutional risk for Wilson County from what seemed to be a series of underlying close associations of members of different

agencies that typically are supposed to be separate parts of the criminal justice process.

78.   By then, the issues were no longer related to a single arrest event.  The arrest had become a convergence point involving false or incomplete records, internal complaints about senior WCSO personnel, Louis's direct involvement, and growing resistance to any neutral review or attempt to assist.

79.   During July 2023, according to later admissions and later-reported accounts, Louis was advising individuals associated with the Sheriff's Office, including persons tied to the HR-related disputes, about how to respond to Caldwell and other county officials.  That conduct placed Louis in the middle of events that were not hers to manage.

80.   It also showed that, well before any formal complaints were received by her office, Louis was already conducting some manner of investigation as to Caldwell.  In early August 2023, an internal source reported that Stewart personally was taking information to Louis for an official-oppression case against Caldwell.  That report is significant because it predates by almost six weeks the September 2023 complaints by Dubs and the former deputy that were later used as the nominal basis for Louis's OAG request.

81.    The timeline therefore does not support any claim that Louis first became involved because her office passively received complaints in September 2023.  The timeline supports the opposite conclusion: Louis was already participating in the effort against Caldwell before those complaints ever arrived.

82.    That early participation also fits the surrounding conduct in July and August 2023, when Louis was being copied on traffic about Dubs and related misconduct, was being directly confronted with the developing facts, and was simultaneously declining to respond openly while remaining active behind the scenes.

83.    In late July and early August 2023, the effort escalated.  In an email dated August 3, 2023, William Richmond from Louis's office attempted to have an employee from Wilson County gather information from Caldwell's computer under the premise that the DA's Office had received an open records request from the San Antonio Express News.  The employee came to Caldwell because he was uncomfortable with the request.

84.    When confronted by Caldwell by email, Richmond replied that he was assisting the Sheriff's Office with an open-records request it had received and stated that he intended to gather responsive communications involving Stewart, Garza, and Caldwell's office.  That explanation did not resolve the

problem.  It sharpened it.  For the same reason it was improper for Louis to provide civil or legal guidance to Wilson County departments—her agency lack authority or standing.

85.   The resulting email traffic and surrounding circumstances reflected conduct consistent with an effort by Louis, acting in concert with Stewart, to gain access to an elected prosecutor's (Caldwell) emails and files through County IT networks, without a warrant or subpoena.  Stewart was copied in that traffic. Louis was included in the resulting chain.  (See Exhibit 2, emails from Caldwell, Stewart, Louis and staff)

86.   Caldwell demanded an explanation.  Louis refused to provide one.  Her silence matters because the request was not peripheral to the controversy.  It went directly to access to Caldwell's communications during the same period in which an official-oppression theory against him was already being discussed internally by her and Stewart.

87.   The sequence of events reflects that the effort to build a criminal case against Caldwell was already underway well before the complaints later used to justify that effort were even presented to her office.

88.   During that summer, the Wilson County Sheriff's Office stopped submitting criminal misdemeanor cases to Caldwell's office for prosecution.  After a person would get arrested, their cases would not move forward.  No efforts

to spur the agency to comply professionally were heeded.    By the time Caldwell left office approximately eighteen months later, there were almost four hundred outstanding cases that had not been filed.

89. In August, Caldwell sought assistance from the Office of the Attorney General.  Caldwell provided evidentiary materials and engaged in email and telephone communications with Abby Fowler, an Assistant Attorney General who worked in the Criminal Prosecutions Division.

90. In the emails and during the phone call between the parties, Caldwell disclosed that the matters involved in the request included serious allegations involving criminal misconduct, some of which involved Louis herself.  That phone call also was recorded.  On September 5, 2023, Fowler notified Caldwell by email that the OAG would not provide any assistance.

91. Then, in the middle of September, 2023, Louis received a complaint from Defendant Dubs.  He submitted a complaint that was typed on her agency form for such complaints and was notarized by her staff.

92. Two days later, Louis received a different complaint from a former deputy that had a copy of Dubs's complaint attached and adopted the facts within it as true and correct.

93.    By that point, however, the supposed official-oppression theory against Caldwell had already been discussed, pursued, and operationalized behind the scenes.  The complaints did not start the process.  They served as a formal wrapper for a process already in motion.

## C. The OAG Enters the Situation

94.    On September 29, 2023, Louis requested OAG intervention.  She did so without disclosing the extent of her prior involvement, prior knowledge and communications, or the degree to which she had already been in the middle of the matter.  Louis stated, "I am requesting your office investigate all potential offenses surrounding this allegation, including any additional county officials. My office is willing to prosecute and pursue any charges resulting from the investigation."  (Exhibit 3, Letter from Louis requesting OAG assistance)

95.    Louis's September 29, 2023 request to the OAG did not arise from an untainted complaint stream.  It arose after weeks of prior involvement, prior knowledge, prior coordination with Stewart's command structure, and prior attempts to gain access to sensitive information that were part of records kept by a separate prosecuting agency.

96.    Louis also did not approach the situation as a neutral prosecutor receiving allegations from unknown sources.  She already had a documented history

with Caldwell involving allegations that she had misused official information, departed from ordinary processes for obtaining or releasing information, and refused direct engagement when confronted.

97. That history matters because it supplies motive, context, and the reason Caldwell recognized her immediate involvement in June and July 2023 as a warning sign rather than a routine prosecutorial referral.

98. Defendant Dickerman was assigned by the OAG after Louis's request. Dickerman was not entering a neutral landscape.  He was entering a matter already shaped by Louis, Stewart, Garza, Dubs, and the preexisting push to frame Caldwell as an official-oppression target.  Dickerman's assignment appears less than neutral as well.  Dickerman had prior connections to Louis's office from an earlier OAG-assisted matter, according to an inside witness.

99. At the same time, the OAG was involved in a major election-related investigation in the 81st District that had been sanctioned by the Attorney General of Texas, Ken Paxton and was being directed locally by Louis.  This broader context increases rather than reduces the questions related to Louis's role.

100. During the course of his investigation, Dickerman focused on one question: whether there had been probable cause to arrest Dubs. He treated other matters as irrelevant.

101. Dickerman did not treat false booking documents, parallel misconduct within the agency, leadership behavior when questioned, or the broader context of retaliation and coordination as relevant to his core analysis.

102. Dickerman's role is reflected by the scope and focus of the investigation: his assignment was not a neutral reset, but a narrowing mechanism. He did not meaningfully investigate the full set of events reported to him. He did not investigate the serious nature of the false-record concerns as an independent issue. He did not investigate the broader misconduct then being reported within the Sheriff's Office as an independent issue.

103. Dickerman did not investigate the role of Louis in the matter before his assignment as being a connected issue. He instead concentrated on whether there had been probable cause to arrest Dubs for making a false statement to an Investigator.

104. That narrowing decision was material to the conclusions ultimately presented, because once the inquiry was reduced to that single question, the surrounding misconduct could be treated as background noise rather than as evidence of motive, falsity, concealment, and retaliation.

105. His recorded interviews were leading rather than neutral.  His report used structural techniques that magnified selected facts and fragmented others. For example, the open-records attempt by the District Attorney's Office was described in multiple separated portions of the report in a way that made it appear as recurring friction between Caldwell's office and the Sheriff's Office that dragged County IT employees into the middle, rather than what it was: a targeted attempt to gain access to Caldwell's materials during the same period Louis and Stewart were already coordinating against him.  That presentation was misleading.

106. Using grand jury subpoenas issued by Defendant Jessica Frazier, Dickerman collected certain records and emails, while avoiding requesting other evidence about issues that he had been told about by Caldwell in a phone call between the two in January of 2024.  Dickerman's recall of that phone conversation was scant in his final report.   However, the call itself was recorded and establishes Dickerman's narrow focus from the beginning.

107. Dickerman also scrutinized in microscopic detail the process by which Olivarez and Mercer sought the warrants in the June 2023 matters and questioned those actions using a far more demanding trial evidentiary standard than would apply at the warrant stage, which requires probable cause.

108. Dickerman further used Caldwell's email traffic with outside entities to suggest knowledge by Caldwell, who was a prosecutor, of affirmative defenses that were irrelevant to a police officer at the point of arrest.

109. The degree of redirection, analytical stacking, and selective emphasis in Dickerman's report was not reasonably attributable to isolated or inadvertent error.   Even so, Dickerman did not accuse Caldwell outright of criminal conduct in the manner later adopted by Comal County.

110. That distinction matters because the later Comal product did more than simply restate Dickerman's work and apply it to elements.  That report discarded Dickerman's findings it's author disagreed with or recharacterized them into something that supported their narrative.

111. Dickerman's report itself reflects it was completed in May 2024, approved by his supervisor on May 24, 2024, and was printed from Dickerman's workstation on June 3, 2024.

112. When it was received by the Comal District Attorneys Office is unknown. In response to an open records request, that office refused to provide a receipt or other documentation that reflects when they got his submission, instead providing a written notification that no responsive public records were identified.  Regardless, after the spring of 2024, Dickerman largely disappeared from the picture.

113.  Dickerman reappears in January 2025 in connection with an issue that occurred in Bee County.  Three weeks after Caldwell and Olivarez had both left the employment and service of Wilson County.

114.  Between late 2023 and early 2024, Caldwell's office also completed the HR/EEOC investigation and issued findings in October 2023.  Those findings and the surrounding circumstances were public.  No efforts were made to address the concerns that were cited. (Exhibit 4, Email to Stewart with Report attached)

**D. Election Choices and Final Year in Office**

115.  The release of this report did not stop the efforts against Caldwell.  In November 2023, Caldwell learned that Louis had initiated a grand-jury investigation into him.  With the close of the candidate filing period approaching and no meaningful way to accomplish his duties as the County Attorney given the current situation or to protect himself from a secret process being used against him, Caldwell decided to not run for reelection as the Wilson County Attorney and to instead run against Louis for her office, the 81st Judicial District Attorney.

116.  Caldwell announced his candidacy in early December 2023.  His decision to run prompted Louis to recuse herself from the investigation she was up to

then leading.  That recusal did not reveal a neutral process.  It confirmed that Louis had already been doing what Caldwell suspected she had been doing.

117.  By the time Louis recused in December 2023, the operative path had already been selected: the matter had been redirected away from scrutiny of conduct by any members of the Wilson County Sheriff's Office conduct towards criminal exposure for Caldwell and those perceived to be aligned with him. The recusal by Louis did not cleanse the process.  It merely preserved what she had already shaped until it was resumed.

118.  On December 14, 2023, Jennifer Tharp, the Criminal District Attorney for Comal County was appointed to handle two complaints of official oppression and any subsequent prosecutions stemming from that investigation. (Exhibit 5, Recusal and Appointment Orders)

119.  The appointment on paper appears limited.  It did not authorize a free-ranging public corruption review, an open-ended narrative construction, or a later publication regime untethered to judicial process.

120.  Caldwell did not learn until later that Tharp had been appointed.  To his knowledge, Caldwell has never met Tharp, or Defendant Sammy Mark McCrary.  Caldwell has had one brief interaction in the past with Defendant Jessica Frazier when she worked for the Bexar County District Attorney's Office.

121. The election campaign that followed was hotly contested and ugly.  During that period, Dubs and others engaged in vicious public attacks on Caldwell and in support of Louis.

122. Information used in some of those attacks could only have come from unofficial Sheriff's Office channels or associated channels.  A witness later provided a statement confirming that Dubs had asked her for assistance in preparing files that were believed to be in furtherance of that effort, that he then gave to one of the parties.

123. In March 2024, Caldwell lost the Republican primary to Louis. The next day, Dubs filed a civil lawsuit against Caldwell and Wilson County.  That lawsuit then sat mostly idle for an extended period.  It did not become the key vehicle of harm until later, when the Comal materials were created and then published through it right before it was dismissed.

124. After the election, the outward pace slowed, but the underlying problem did not. Caldwell's office continued receiving reports of misconduct involving the Sheriff's Office and Louis.   At the same time, his office also received reports of other public-corruption issues involving county commissioners related to the sale of county equipment, improper use of county equipment for personal gain, improper relationships with county contractors, and also one corroborated report concerning a large quantity (almost a kilo) of

methamphetamines missing from the Wilson County Sheriffs Office evidence room, and other related misconduct.

125. At least one of those developments led to the arrival of Texas Ranger Bradley Freeman from the Public Integrity Unit and FBI Special Agent Monroe Giese. They presented themselves as if they were there about a county-commissioner-related public corruption matter. Yet in every interview, Caldwell was always a subject of their questioning.

126. During Caldwell's interview, Freeman and Giese refused to tell him who had requested them or who was overseeing their investigation. Caldwell later learned that the initial request to the Rangers had been made by County Judge Whitman in connection with a matter involving County Commissioner Jeffery Pierdolla and county equipment.

127. After they arrived, Freeman and Giese met with Whitman once and then stopped interacting with him in any meaningful way. Instead, they worked in coordination with Louis. Whitman revealed to Caldwell that he learned afterwards that Louis had told others he also was being investigated. The scope of this investigation seemed to be unlimited in nature and focused on potential misconduct involving Caldwell while not pursuing comparable lines of inquiry concerning other reported conduct by other actors like Louis or anyone associated with the Wilson County Sheriff's Office.

128. Additionally, much like Dickerman before, Giese's participation appears less than coincidental as well.  Giese also had prior connections to Louis.  Records show he had been assigned to a separate, unrelated complaint of misconduct specifically about Audrey Gossett Louis around 2020.   It appears the FBI had refused to take any action on the complaint.

129. On November 21, 2024, Caldwell's interview with Freeman and Giese occurred in his office.  They asked some questions related to Pierdolla and the sale and purchase of equipment but refused to identify the scope of their investigation or who besides Pierdolla might be a suspect.   Freeman and Giese both were evasive about any matters concerning Pierdolla besides the equipment sales and refused to discuss a report Caldwell had received about this commissioner, Dubs, and the Sheriff's Office.

130. Noting their evasiveness, Caldwell stopped the circular discussion and notified both he was making an official and formal referral to each of their respective agencies citing applicable state and federal authority, requesting an investigation be performed by each agency into systemic misconduct and crimes against public administration alleged to have been committed by officials and employees of Wilson County and the 81st Judicial District.

131. Caldwell provided the Ranger and Special Agent each separate referral letters and a flash-drive that contained a uniquely-named, agency designator

folder that contained eight sub-folders organized by subject or entity, each containing materials that had been collected or generated documenting serious public-corruption and misconduct issues involving multiple officials, including Louis, Stewart, county commissioners, and members of the Sheriff's Office.  (Exhibit 6, Letters of referral to Tx Rangers and FBI)

132.   Both were ready to leave at that point.  They nevertheless accepted the materials.  Giese signed a receipt accepting his file packet. Freeman refused, as notated on his receipt by Caldwell after he left.   The referrals cut the meeting short, however, the recording of the meeting clearly captures when Caldwell expressly tells them both on the way out, that "if they felt the desire to share the material with Louis, they might as well add their names to the list."

133.   Caldwell followed up with both by email on December 2, 2024 with additional material.  Neither responded.  Caldwell followed up again from his private practice email on January 29, 2025 with more information, including what had happened to Olivarez in Bee County.  Freeman responded only that it would not be proper to discuss the matter with Caldwell since he was no longer the County Attorney, and that they would brief his successor and if she wanted to tell him she could.  By that point, Olivarez had already been harmed.

## E.  Bee County Employment Interference

134.  Olivarez left the Wilson County Attorney's Office in good standing on December 31, 2024 and began work at the Bee County Sheriff's Office on January 1, 2025.  He had passed a background check without any issues. Bee County's own records reflect that Olivarez worked for the Wilson County Attorney's Office and that the Wilson County Sheriff's Office did not employ, direct, or control his work.

135.  On January 16, 2025, in the space of one afternoon, Bee County Chief Deputy Russell Kirk was informed by a law-enforcement officer from a neighboring agency that Olivarez was supposedly pending criminal indictment in Wilson County.

136.  Kirk then directly contacted Garza.  Garza told Kirk that Olivarez had been involved in arresting a Wilson County Sheriff's Office lieutenant and that there was controversy surrounding the legalities of that arrest, and Garza directed Kirk to speak with Dickerman.

137.  Kirk then contacted Dickerman. Dickerman told Kirk that Olivarez was the target of a criminal investigation involving the arrest of the Wilson County lieutenant, that Olivarez had signed an affidavit for the arrest based on a civil accusation and not a criminal charge, and that the criminal case on Olivarez was currently pending grand-jury indictment in Comal County after

a change of venue.   This is reflected in a memorandum that was added into Olivarez's file and discovered later.  (Exhibit 7 Bee memorandum in Olivarez file)

138.   All of those statements were false.  No indictment had been returned against Olivarez.  No case was filed.  No such pending grand-jury indictment existed or materialized.

139.   Regardless, Bee County Sheriff Randy Aguirre relied on those statements and on January 17, 2025, Olivarez was forced to resign.

140.   The falsehood of the Bee County statements is reinforced by Dickerman's own later positions.  In a later sworn affidavit, Dickerman claimed that in January 2025 he merely told a sheriff's deputy that Olivarez was involved in his investigation but that he could not comment on specifics because the District Attorney's Office investigation was ongoing.

141.   That affidavit is inconsistent with the contents of the Bee County memorandum, which states that Dickerman told Kirk the case was currently pending grand-jury indictment in Comal County.  (Exhibit 8)

142.   It also cannot be reconciled with the completion and approval dates on Dickerman's own report, which show the investigation had already been completed and approved months earlier.

143. Those contradictions are not minor.  They go directly to falsity, scope, and intent.  Dickerman's later position cannot be squared with itself.  Nor can it be reconciled with the Bee County memorandum or with the completion date reflected on his own report.

144. The contradiction is not merely evidentiary impeachment.  It is direct proof that Dickerman used his office and investigative status to convey materially false criminal-status information to a third-party employer after the investigative phase he claimed to be acting within had already concluded.

145. That use of Dickerman's official position directly caused harm to Olivarez and also advanced the broader objective of discrediting Caldwell by striking at a close subordinate and witness associated with him.

**F. The Comal County Reports and Caldwell Bar Grievance**

146. The Comal Special Prosecutor phase did not result in any indictments or charges filed against Caldwell or anyone else.   However, the Comal Criminal District Attorney did not simply receive a file, review the reports and decline to file charges.

147. Tharp and her co-defendants repurposed an investigation that would not support a conviction into an accusatory publication mechanism.

148. The Comal defendants are all experienced career prosecutors with accolades, board certifications, and distinctions that support their level of experience. By the time Tharp, McCrary, and Frazier acted, they were not dealing with an empty record or a thin file. They had access to multiple layers of material, including OAG investigative materials, and records from other agencies they should not have had.

149. In March 2025, Ranger Bradley Freeman provided materials to Comal Assistant Criminal District Attorney Jessica Frazier in Comal County, Texas after coordinating about logistics. The extent of the materials is unknown. However, what is indisputable is that some of the materials originated from what Caldwell had previously provided to Ranger Freeman and Special Agent Giese on November 21, 2024 to take back to their respective agencies.

150. There was no legitimate law-enforcement reason for a representative from one of the two pre-imminent law enforcement agencies charged with the responsibility of investigating public corruption to transfer reports received from a then-prosecutor that contained allegations of official misconduct, including confidential complainant and witness information, to Comal County for use in a grand jury investigation they had been appointed to perform about the referring prosecutor. This transfer only became visible

because of what happened later in the State Bar of Texas grievance process. After much more damage had already been done.

151. Regardless of how it was received, by the Spring of 2025, Tharp and her co-defendants had enough material in their possession to be able to see all sides of the situation going on in Wilson County and with the 81st Judicial District Attorney, Audrey Gossett Louis.

152. The significance of the evidence in their possession is straightforward: before McCrary's documents were finalized and published, Comal actors had enough material in hand to know that the accusatory narrative they were preparing was, at minimum, highly suspect.  The issue was not lack of access to contrary evidence.  The issue was the decision to move forward despite access to contrary evidence.

153. On June 27, 2025, Chief Felony Prosecutor Sammy Mark McCrary signed two so-called "non-prosecution affidavits."  Those documents were misleading in form, substance, and effect.   They were styled as *"The State of Texas v. Joshua Olivarez."* and *"The State of Texas vs Thomas Caldwell, Joshua Olivarez, and Dwayne Mercer."*  There was no case number on the documents. (Exhibits 8 and 9)

Example 1:

**THE STATE OF TEXAS**          **DISTRICT COURT**
**VS**                         **OF**
**JOSHUA OLIVAREZ**            **WILSON COUNTY, TEXAS**

Example 2:

**THE STATE OF TEXAS**          **DISTRICT COURT**
**VS**                         **OF**
**THOMAS CALDWELL,**           **WILSON COUNTY, TEXAS**
**JOSHUA OLIVAREZ, AND**
**DWAYNE MERCER**

154.  The prior orders of recusal and appointing Tharp had been styled as show:

Example 3:

CAUSE NO. _____

| IN RE THE MATTER OF | § | IN THE DISTRICT COURT |
| | § | |
| | § | 81st/218th JUDICIAL DISTRICT |
| | § | |
| THOMAS PAUL CALDWELL, et al | § | WILSON COUNTY, TEXAS |

155.  No true bill of indictment had ever been returned by a Grand jury.   No criminal information had ever been filed.  No court had jurisdiction over any actual criminal prosecution based on the styles contained in the captions in Ex. 1 and 2 above.

156.  The document that only names Olivarez conflicts with the findings contain in Dickerman's report and makes a finding that Olivarez did not violate the

law when he obtained an arrest warrant for the individual who was the subject of the fraudulent booking sheets. The document that names Caldwell, Olivarez, and Dwayne Mercer, another investigator with Caldwells former office, also conflicts with Dickerman's findings.

157. These documents are reflected by what the Comal County Criminal District Attorneys Office already possessed. Those documents were not neutral summaries based upon a review of all the evidence in their possession. They included findings, evaluative conclusions, and accusatory framing far beyond what was necessary to memorialize a simple decision not to prosecute.

158. McCrary's reports functioned as accusatory findings outside of any judicial proceeding. They operated like substitute charging, trial, and sentencing narratives published outside constitutional process.

159. The focus of the primary report was Caldwell. The bias and vitriol projected at him was obvious. Olivarez and Mercer were treated unfairly, but not to the degree that Caldwell was. They were both laid out at cops following orders from the guy that couldn't be charged.

160. McCrary states in the primary document: "The facts of this case include a tangled mess of public officials and peace officers in Wilson County." He then proceeds to analyze the events that occurred in June and July of 2023,

with a focus on cherry picked portions of emails and texts from Caldwell during the time, to make conclusory statement after conclusory statement certifying Caldwell's guilt throughout the document.

161. At the end of the thirty-two page document, the first of many legally awkward findings by McCrary states:

"Based on my review of Sgt. Dickerman's investigation along with all of the supporting documents such as witness statements and emails, there is certainly probable cause to believe that members of the Wilson County Attorney's Office committed both criminal offenses and ethical violations in relation to the arrest of Joseph Dubs. Ultimately, however, the decision of whether or not to file a case should not just be a decision of whether the standard of probable cause can be met. At trial, the State is required to prove a defendant committed an offense beyond a reasonable doubt. Additionally, the jury's verdict must be unanimous. This requires a consideration and weighing of the strengths and weaknesses of a case.

Although it is my opinion that Thomas Caldwell is the person most responsible for the Dubbs *[sic]* arrest, the weakest criminal case is against Caldwell. Each of the defendants would no doubt argue that the fact that a magistrate found probable cause and issued a warrant for Joseph Dubs shows that his subsequent arrest was legal and, because he was not subjected to an unlawful arrest, they could not have committed official oppression in relation to the Dubs arrest. In addition, Thomas Caldwell will undoubtedly rely upon Mercer's

claim that he decided to write the criminal complaint on his own without any consultation with Caldwell. Finally, Sgt. Dickerman specifically concluded in his report that, "[a]fter investigation, there is insufficient evidence at this time to show that Thomas Caldwell committed an offense." (Dickerman's report, page 19 at 1.59). Undoubtedly, the defense will attempt to utilize Dickerman 's conclusion to undermine any prosecution of Caldwell. These facts make this a difficult case for the State."

162.   On the next page, McCrary continues his analysis in pertinent part:

"The decision of whether or not to file a criminal charge also requires consideration of issues beyond the likely success of a subsequent prosecution. Texas Code of Criminal Procedure 2.01 specifically provides, "[i]t shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done.'"

"As set out in the analysis above, I have found there is probable cause to believe Thomas Caldwell abused his public office as county attorney. However, the highest level of offense that is supported by the evidence is a Class A misdemeanor. The maximum punishment for such an offense is 1 year in a county jail. Additionally, the potential defendants likely have no criminal record (as such would have likely prevented them from being peace officers or the county attorney). Therefore, it is my opinion that even if the State was successful in obtaining a conviction against any of them, they would likely receive community supervision ( commonly referred to as probation). Thus, this is not a situation

where the State would be seeking a lengthy prison sentence against a violent criminal to protect the public. The primary benefit of a criminal prosecution against Thomas Caldwell would be to ensure that he does not have the opportunity to engage in such conduct again. That in turn naturally leads to a question of what is the most effective way to achieve that result."

163.   Having pronounced Caldwell guilty of abuse of office, at that point, McCrary shifts to seemingly deciding Caldwells fate:

"If the State files a case of Official Oppression against Caldwell, he is arrested, and the State is ultimately unsuccessful in obtaining a conviction, I expect that Caldwell would then attempt to expunge his arrest and all records and documents in this matter, effectively making this matter disappear from the public record. On the other hand, an arrest is a "threshold requirement under the expunction statute." *Carson v. State*, 65 S.W.3d 774, 779 (Tex. App.-Fort Worth 200 l, no pet.) (op. on reh'g). Thus, if this case is not filed and Caldwell is not arrested, he is not entitled to an expunction and the records of his actions will remain.

Currently, Thomas Caldwell does not hold public office. Should he seek public office in the future, all of the statements and reports in this case would be available for consideration. In effect, instead of six jurors in a misdemeanor trial, Caldwell's jury would be the entire electorate who could decide if Caldwell is suitable to hold public office in light of his conduct in this case. Based on the difficulties in seeking a conviction in this case, I believe that ensuring that all of the documents concerning Caldwell's conduct

are preserved may ultimately provide more protection for the public than prosecuting this case."

164.  McCrary then continues to assess even more penalties to Caldwell:

"Finally, I have also considered availability of other remedies that may be used to deal with the unacceptable conduct set out above. Currently, Joseph Dubbs *[sic]* has a pending civil suit filed against Caldwell based on his role in having him arrested as set out above. Additionally, there appears to be grounds to believe that Thomas Caldwell committed ethical violations and may be subject to disciplinary action by the State Bar or Texas. Our office has an ethical obligation to submit this matter to the Bar for their consideration and will do so. Therefore, Caldwell's conduct will be subject to review and professional discipline in a different forum.

It is because of all of these considerations that I have decided that no prosecution will brought in this case."

165.  So with this, McCrary expressly confirms the chances of a conviction are not optimal, and then illustrates the degree of premeditation and strategy that went into the drafting of this document by addressing that the possibility of the records being sealed or expunged had been considered and they had decided a way around it, and how the records can now be used in all manner of extrajudicial means to hold Caldwell accountable instead.

166. McCrary signed these reports on June 27, 2025. One day before the statute of limitations expired on any charge of official oppression that could be filed on Caldwell or Olivarez.

167. Incidentally, Defendant Sammy Mark McCrary is Board Certified in Criminal Law by the Texas Board of Legal Specialization.

168. On July 1, 2025, McCrary's boss, District Attorney Tharp emailed a letter with the McCrary materials to recipients that included Judge Russell Wilson, Defendant Louis, and Wilson County Attorney Theresa Nettles. That transmission placed the McCrary documents into circulation at a governmental level. (Exhibit 10, Letter from Tharp to Wilson, Louis, and Nettles.)

169. In her letter to the Judge, Tharp ratifies McCrary's work by notifying Judge Wilson, "Enclosed please find my Non-Prosecution Affidavits for the case my office was appointed to review involving Official Oppression committed by Thomas Paul Caldwell, former County Attorney of Wilson County, and/or employees of his office."

170. Tharp refers to the documents as "Non-Prosecution Affidavits," yet the documents are not sworn to by McCrary under penalty of perjury. There is not even an unsworn declaration attached to either.

171. Tharp fails to reconcile these documents with the typical use of non-prosecution affidavits in Texas criminal jurisprudence— where a victim or person who was the complainant in a criminal case requests the State to consider not initiating or dismissing the case.

172. Tharp then goes on to state she has already given the report to Dubs. along with other evidence collected, and will likely be requesting additional permission to give him more that was obtained using grand jury subpoenas in the future.

173. Finally, and most shockingly, Tharp goes on to instruct a sitting District Court Judge about how he should rule in the future because her office investigated and cleared Joseph Dubs and that "we do not believe that attempts to impeach, Lt. Dubbs *[sic]* on the False Report arrest would be appropriate."

174. On July 2, 2025, Dubs's lawyers filed their response to an existing Plea to the Jurisdiction in his civil case with McCrary's 32-page report attached as an exhibit.  (Exhibit 11, Response document filed by Dubs Lawyer Ricardo Cedillo)

175. This confirmed what Tharp had represented the day before—Dubs had been given that material by Comal County.

176. The report itself expressly referenced Dubs's civil suit as one of the mechanisms through which Caldwell could be held accountable.

177. On July 3, 2025, when the document that had been sent *ex parte* by Tharp just two days prior was brought before Judge Russell Wilson, who was presiding over what was supposed to be a hearing on Wilson County's pending plea to the jurisdiction, Judge Wilson stopped the hearing at once and recused himself from the bench.

178. The publication mechanism had worked.  The report had been converted from internal product into a public accusatory instrument.  Tharp did not stop there.

179. On July 21, 2025, Tharp filed a Bar grievance against Caldwell. In that submission, she enclosed material that apparently was not satisfactory, because the State Bar requested changes or redactions.

180. In that same grievance letter, Tharp affirmatively argued that there was reason to believe Caldwell had violated disciplinary rules in an email he had sent to Stewart and in how the investigators had secured arrest warrants by relying upon on the very materials her office had assembled and published.

181. Tharp's actions were not passive forwarding. That was active adoption, republication, and redeployment of the same narrative in a separate forum for separate harm.

182. Tharp therefore did more than just accept McCrary's work; She ratified it and republished it.

183. On October 22, 2025, Jessica Frazier sent a supplemental letter to the State Bar explicitly supplementing the grievance previously filed by Tharp and enclosing redacted OAG materials, and the non-prosecution affidavit in file folders. She signed this letter instead of Tharp. (Exhibit 12, July and October submissions from Tharp and Frazier.)

184. Frazier therefore did more than assist with internal case processing. She affirmatively continued the publication and disciplinary deployment of the Comal narrative. Frazier's role therefore was not clerical or incidental. She functioned as the continuity link between the investigative pipeline, the McCrary documents, and the State Bar publication channel.

185. The Bar materials also exposed another critical fact. The digital folder Caldwell had uniquely created and hand-delivered to Giese in November 2024 was present in Tharp's Bar materials in altered form.

186.   The original flash drive given to Special Agent Giese as part of a Federal referral contained approximately 767 files.

Example 4:



187.   These first grievance-related submissions that were served upon Caldwell showed the same primary folders but with most subfolders missing and all the contents deleted or removed.

Example 5:



188. Caldwell notified the State Bar of the issue to confirm there was not an issue downloading the file.   The Bar representative confirmed that they were going to have to re-request the folders, presumably from Tharp's office.

189. A later submission contained a small amount of files, but the pattern of what was absent and what remained reflected selective knowledge rather than random omission.

Example 6:



190. The missing evidence tracked the material most damaging to Louis, Stewart, and the Wilson County Sheriff's Office.  Almost the entirety of the folders containing evidence about both agencies was missing,

191. Whoever performed that curation had to know what mattered and to whom it mattered.   The pattern of deletion was too specific to be random.

192. It required firsthand or functionally equivalent knowledge of what content was dangerous, what content was useful, and what content had to be removed to preserve the accusatory shape of the narrative

193. The same is true of what McCrary's report omitted.

194. Although the Comal DA Defendants all had access to materials contradictory to the accusatory narrative, those contradictory materials were not incorporated into the final public-facing product in a way that would have undermined the result.

195. This selective culling of evidence is important for another reason. It shows that Comal actors were not merely consuming a fixed record. They were participating with other Defendants in the construction of the record that would be used against Caldwell.

196. The same point applies to Olivarez. The additional material Caldwell provided to both Ranger Freeman and Special Agent Giese in January of 2025 contained information about what had occurred in Bee County and how it had harmed Olivarez.

197. Tharp, McCrary, and Frazier continued fabricating the accusatory narrative, while aware that Olivarez had already been treated as a criminal target outside lawful process, including through the Bee County event.

198. Yet nothing in the Comal publication path ever once attempted to correct that. Nothing in the report disclosed the contradictions that had already become apparent. Instead, the goals for the intended use remained steady and the publication path continued.

199. That continuation is part of the constitutional harm, not collateral to it.

## G. The Extent of Involvement Becomes Apparent

200. On August 14, 2025, Louis obtained indictments against Wilson County Commissioner Jeffery Pierdolla and Wilson County's Auditor, Brenda Trevino.

201. Trevino was one of the original officials who had questioned Pierdolla's actions at the time and who had assisted in the investigation.. Trevino also had been a member of the human resources committee who had investigated the complaints of sexual harassment and retaliation involving the Sheriffs Office and Garza in 2023.

202. That grand-jury presentation was done by Louis alone. Her two witnesses were Ranger Bradley Freeman and Special Agent Monroe Giese.

203. At the time of the grand jury, Freeman and Giese had already received Caldwell's materials and failed to engage in any meaningful engagement or followup with the original submitting official.

204. They were working in coordination with Louis, the subject of several of the complaints to help create the condition where the facts were split into two tracks: one track protecting those aligned with Louis and one track intensifying pressure on those aligned with Caldwell.  On information and belief both did what Caldwell had expressly warned them about as they left his office on November 21, 2024— they had taken the material right back to Louis and that is where it stopped.

205. Caldwell maintained contact with several of the complainants and not one has ever stated they have been contacted by any agency about their complaints or what they reported.

206. In late November 2025, because Caldwell was notified of the Bar grievance, he learned that the materials he had provided to Freeman and Giese had not been forwarded through their agencies.  Prior to that he had made numerous requests for information and additional reports to the FBI and DOJ but to date has never been contacted once by any agency about what he reported.

207. In February 2026, Caldwell learned that Freeman had been the source of the transfer to Comal.  At that point, the logistics and sequencing for everything that had occurred became apparent based on the sequence of events into view.

208. The sequence began with direct reporting of misconduct in June 2023.

209.  It continued through immediate coordination between Stewart and Louis.

210.  It advanced through the attempted acquisition of Caldwell's emails and files in August 2023.

211.  It was formalized by Louis's OAG request and Dickerman's narrow, stacked investigation.

212.  It intensified through campaign-period attacks and the continued use of unofficial information.

213.  It was reinforced by the false Bee County statements that cost Olivarez his job.

214.  It culminated in the McCrary documents, their transmission by Tharp, their public filing through Dubs, their use since by Wilson County and their repackaging into a Bar grievance by Tharp and Frazier.

215.  At no point did Defendants submit their accusations to ordinary constitutional safeguards before using them to damage Plaintiffs.

216.  They did not obtain indictments.

217.  They did not initiate criminal cases against Plaintiffs that could be tested in court.

218. They instead built and published a criminal narrative outside the judicial process while using the forms, actors, and formality of official government agencies to make that narrative stick.

219. That conduct has harmed Caldwell as a former public official and then as a private citizen.

220. It has harmed Olivarez directly in his employment, his reputation, and his ability to continue working as a peace officer.

221. The harm was not accidental.

222. It was the foreseeable result of a coordinated sequence of actions in which each stage reinforced the next.

## SECTION V.   COORDINATION AND AGREEMENT AMONG DEFENDANTS

223. The conduct described above did not occur in isolation or through independent decision-making by individual actors. It unfolded through a sequence of actions in which information, materials, and investigative direction moved between Defendants in a manner based on the timing, sequencing, and interdependence of actions.

224. Following Caldwell's June 2023 reports of misconduct within the Wilson County Sheriff's Office, Defendants Stewart and Garza—both of whom had

actual knowledge of the underlying facts—did not pursue corrective or disciplinary action. Instead, information concerning those matters began moving outside of Caldwell's office and into channels involving Defendant Louis, including communications and document requests that sought access to internal County materials under false or misleading pretenses.

225. By early August 2023, before any formal complaint had been submitted to Louis by Dubs or the former deputy, information had already been gathered and transmitted for the purpose of pursuing allegations against Caldwell. This sequence—notice to Stewart, immediate external communication, and pre-complaint targeting—reflects a shift away from internal investigation and toward the development of a case against the reporting official.

226. The complaints later submitted by Dubs and the former deputy were not independent initiating events. The deputy's complaint expressly incorporated Dubs' allegations, and both were received after investigative activity had already begun. Their use within subsequent investigative processes provided a formal structure for allegations that had already been identified, discussed, and circulated among Defendants.

227. The investigation conducted through the Office of the Attorney General did not proceed as a neutral inquiry into competing allegations. It focused on a limited theory favorable to Dubs while excluding or minimizing broader

evidence of misconduct and contextual information provided by Caldwell. The resulting report incorporated derivative statements and fragmented factual events in a manner that reinforced a particular narrative rather than objectively testing it.

228. At the same time, materials provided by Caldwell to law enforcement authorities, were not pursued with comparable scope or neutrality, despite including allegations involving multiple actors, including Louis. Instead, investigative activity continued to center on Caldwell, while information flowed toward entities and individuals who later participated in the creation and publication of accusatory materials.

229. The transmission of investigative materials from Freeman to Comal County, and the subsequent use of those materials by Defendants Tharp, Frazier, and McCrary, further reflects a coordinated progression of the same narrative across agencies.

230. Prior to finalizing the "Non-Prosecution Affidavit," those Defendants possessed or had access to information that conflicted with the conclusions presented, yet the final document adopted a version of events consistent with earlier investigative framing.

231. The content, structure, and dissemination of the "Non-Prosecution Affidavit" were consistent with the investigative direction established in earlier phases.

The document did not arise as an independent evaluation of evidence, but as the culmination of a process in which information had been selectively gathered, shaped, and transmitted among Defendants.

232. The timing of events—including pre-complaint investigative activity, the sequencing of complaints, the narrowing of investigative scope, the transfer of materials across agencies, and the final publication of accusations after no prosecution was pursued—supports a reasonable inference that Defendants reached an understanding, whether explicit or tacit, to develop and disseminate a criminal narrative concerning Caldwell outside of the judicial process.

233. Each Defendant's actions contributed to that objective by:

    a. generating or adopting allegations;

    b. controlling or filtering the flow of information;

    c. conducting or shaping investigative activity; or

    d. formalizing and publishing the resulting narrative.

234. Taken together, these actions reflect a coordinated course of conduct undertaken under color of state law that resulted in the creation and dissemination of accusations of criminal conduct without indictment, judicial review, or adversarial testing.

235. Defendants reached an agreement, whether express or tacit, to engage in the conduct described herein, including the development, adoption, and dissemination of a criminal narrative concerning Plaintiffs outside the judicial process.

236. This agreement is supported by the timing, sequencing, and interdependent nature of Defendants' actions, including pre-complaint investigative activity, coordinated information flow, selective use of evidence, and the ultimate publication of accusatory materials.

237. The actions taken by each Defendant were not isolated but were undertaken with knowledge of and in furtherance of the shared objective of discrediting Plaintiffs and subjecting them to the consequences of criminal accusation without indictment or judicial review.

## SECTION VI.  DEFENDANTS' CONDUCT WAS INVESTIGATIVE, ADMINISTRATIVE, AND EXTRA-JUDICIAL, NOT PROTECTED ADVOCACY

238. At all relevant times, Defendants acted under color of state law. However, the conduct at issue in this case was not limited to the initiation or prosecution of a criminal case and did not occur within the scope of traditional advocative functions protected by absolute prosecutorial immunity.

239. Instead, Defendants engaged in investigative, administrative, and extra-judicial conduct, including the gathering, shaping, and dissemination of information outside of any pending judicial proceeding.

240. The actions forming the basis of Plaintiff's claims occurred in the absence of any indictment, criminal filing, or adversarial process, and therefore fall beyond the protected advocative functions recognized under applicable law for which absolute immunity is recognized.

## A. Investigative Conduct

241. Defendants, including but not limited to Dickerman, Freeman, and Louis, participated in investigative activity involving witness interviews, evidence collection, and the evaluation of allegations prior to any prosecutorial decision.

242. This conduct included:

   a. receiving and reviewing complaints;

   b. conducting interviews of witnesses and involved parties;

   c. collecting and assessing documentary evidence; and

   d. determining the scope and direction of the investigation.

243. Such conduct is investigative in nature and is not entitled to absolute immunity.  See *Buckley v. Fitzsimmons*, 509 U.S. 259, 273–76 (1993)

(prosecutors not entitled to absolute immunity for investigative or administrative conduct).

## B. Administrative and Supervisory Conduct

244. Defendants Stewart and Garza exercised administrative authority over internal investigations, evidence control, and the handling of misconduct allegations within WCSO.

245. This included:

    a. receiving and disregarding documented reports of misconduct;

    b. controlling access to internal information and communications;

    c. directing the routing of communications through specific channels; and

    d. failing to preserve or produce relevant evidence.

246. These actions are administrative and supervisory functions, not prosecutorial advocacy, and are not protected by absolute immunity.

## C. Extra-Judicial Creation and Dissemination of Accusations

247. Defendants Tharp, Frazier, and McCrary engaged in conduct that was neither prosecutorial advocacy nor part of any judicial proceeding by creating and disseminating a document labeled a "Non-Prosecution Affidavit."

248. That document:

    a. was not sworn;

    b. was not filed in any court;

    c. not undertaken as part of initiating or presenting a criminal prosecution; and

    d. was disseminated to third parties outside any adversarial process.

249. To the extent the document reflects internal prosecutorial evaluation, Plaintiffs do not challenge that function; rather, this claim arises from its external dissemination and use. The preparation and publication of such a document for internal use would arguably be within the scope of a prosecutors duties. However, the extra-judicial content within this particular document and how the document was then utilized fall outside the scope of protected prosecutorial functions.

250. Similarly, the transmission of investigative materials to third parties, including courts, attorneys, and other entities for purposes unrelated to any pending prosecution, constitutes administrative and extra-judicial conduct not entitled to absolute immunity. *Id.* at 277–78 (no absolute immunity for statements made outside judicial proceedings).

251. While the decision whether to initiate or decline prosecution is a function protected by absolute prosecutorial immunity, the creation, formatting, and

dissemination of accusatory materials to third parties outside any judicial proceeding, and for purposes unrelated to the initiation or prosecution of a case, are not advocative functions and are not entitled to absolute immunity.

252. The acts described herein were undertaken after the decision not to prosecute had been made and were directed toward publication, reputational impact, and collateral consequences rather than any judicial proceeding.

## D. Absence of Judicial Process

253. At no point did Defendants initiate a criminal prosecution against Plaintiff.

254. No indictment was obtained.

255. No information was filed.

256. No arrest warrant was sought or issued based on the accusations later published.

257. Because Defendants did not pursue charges through the judicial system, their conduct cannot be characterized as advocacy "intimately associated with the judicial phase of the criminal process."

258. Alternatively, and to the extent Defendants contend that their conduct does not fall within the scope of the Fourth Amendment, the conduct described herein constitutes a deprivation of liberty cognizable under the Fourteenth Amendment, including stigma-plus and procedural due process violations

arising from the use of governmental authority to impose the consequences of criminal accusation without judicial process.

**E. Qualified Immunity Does Not Apply**

259. The constitutional rights at issue were clearly established at the time of Defendants' conduct. No reasonable official would believe it lawful to:

260. fabricate or materially distort evidence in a criminal investigative context;

261. create and disseminate accusations of criminal conduct outside of any judicial process;

262. use governmental authority to impose the consequences of criminal accusation without affording procedural protections; or

263. coordinate investigative and prosecutorial activity to target an individual while avoiding judicial review.

264. Defendants' conduct, as described herein, violated clearly established law under the First, Fourth, and Fourteenth Amendments.

**F. Functional Analysis Controls**

265. Immunity determinations turn on the function performed, not the title of the actor. To the extent any Defendant asserts absolute or qualified immunity, such defenses must be evaluated based on the specific conduct at issue.

266. Here, the conduct forming the basis of Plaintiff's claims was investigative, administrative, and extra-judicial in nature and therefore not entitled to absolute immunity.

**SECTION VII — COUNTS**
**COUNT I — 42 U.S.C. §1983**
**FIRST AMENDMENT RETALIATION**
**(Against All Individual Defendants in Their Individual Capacities)**

267. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

**A. Protected Activity**

268. At all relevant times, Plaintiffs engaged in speech and conduct protected by the First Amendment.

269. Plaintiff Caldwell's protected activity included reporting misconduct within a law enforcement agency, communicating those concerns to government officials, documenting evidentiary irregularities, seeking state and federal intervention, and running for public office.

270. Plaintiff Olivarez's protected activity included participating in the investigation of law enforcement misconduct, requesting and evaluating evidence, assisting in exposing false or misleading records, and maintaining professional association with Caldwell.

271. Plaintiffs' speech addressed matters of public concern, including law enforcement integrity, misuse of official authority, and public corruption. See *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Lane v. Franks*, 573 U.S. 228, 238–40 (2014) (truthful speech outside ordinary job duties is protected); *Anderson v. Valdez*, 845 F.3d 580, 590–92 (5th Cir. 2016)

## B. Defendants' Knowledge

272. Defendants had actual knowledge of Plaintiffs' protected activity.

273. Stewart and Garza were directly informed in recorded meetings on June 15 and June 19, 2023.

274. Louis had actual knowledge through direct communications, inclusion in email traffic, and her behind-the-scenes involvement beginning in June 2023.

275. Defendants knew Olivarez's role as the investigator responsible for uncovering the underlying misconduct and his association with Caldwell.

## C. Adverse Actions

276. Defendants took adverse actions that would deter a person of ordinary firmness from engaging in protected activity. See *Keenan v. Tejeda*, 290 F.3d 252, 258–59 (5th Cir. 2002) (actions that would deter a person of ordinary firmness include retaliatory investigation and harassment).

277. As to Caldwell, those actions included:

    a. Initiating and coordinating an official-oppression theory before formal complaints were received;

    b. Attempting to obtain Caldwell's communications through Wilson County Information Technology staff under a pretextual open-records justification;

    c. Directing or influencing an OAG investigation while withholding prior involvement;

    d. Steering investigative focus away from reported misconduct and toward Caldwell;

    e. Causing the creation and publication of accusatory materials outside judicial process; and

    f. Republishing those materials through civil litigation and a State Bar grievance.

278. As to Olivarez, those actions included:

    a. Disseminating false information that he was the subject of a pending criminal indictment;

    b. Causing Bee County to rely on that false information;

    c. Forcing his resignation and impairing his ability to continue in law enforcement.

## D. Causation and Retaliatory Motive

279. Defendants' actions were motivated, at least in part, by Plaintiffs' protected activity.

280. Temporal proximity supports causation, including:

    a. Immediate coordination between Stewart and Louis following June 2023 disclosures;

    b. Development of a criminal theory against Caldwell before formal complaints; and

    c. Escalation through investigative, administrative, and publication mechanisms.

281. Defendants' conduct also reflects retaliatory motive through:

    a. Selective targeting of Plaintiffs while disregarding underlying misconduct;

    b. Escalation from internal interference to external publication; and

    c. Use of third-party dissemination to amplify harm.

282. Defendants specifically targeted Plaintiff Olivarez because of his known role in assisting, supporting, and carrying out the protected activity of Plaintiff Caldwell, and because of his association with Caldwell in exposing misconduct within the Wilson County Sheriff's Office.  See *Keenan v. Tejeda*, 290 F.3d 252, 258–59 (5th Cir. 2002); *Deville v. Marcantel*, 567 F.3d 156, 170–72 (5th Cir. 2009).

### E.  Clearly Established Law — Specific Application

283.  At all relevant times, it was clearly established that in materially similar circumstances involving the dissemination of false criminal-status information to third parties or to a third-party employer for the purpose of causing adverse employment action violates the First Amendment.

284.  Reasonable officials in Defendants' position would have understood that representing an individual as the subject of a pending indictment, when no such indictment existed, for the purpose of affecting employment, was unlawful.

285.  It was further clearly established that the use of investigative authority as a tool of retaliation, including the initiation or shaping of investigations in response to protected speech, violates the First Amendment.

### (a) Misuse of Investigative or Legal Processes

286.  Officials may not initiate or manipulate investigative or legal processes in retaliation for protected speech.  See *Hartman v. Moore*, 547 U.S. 250, 256–59 (2006); *Deville v. Marcantel*, 567 F.3d 156, 170–72 (5th Cir. 2009); *Miller v. Town of Addison*, 779 F.3d 421, 429–31 (5th Cir. 2015) (recognizing retaliatory misuse of investigative authority).

287.   A reasonable official would have known that using investigatory authority to construct or advance a retaliatory case violates the First Amendment.

### (b) Dissemination of False Information

288.   It was clearly established that knowingly providing false or misleading information to third parties in order to cause adverse action constitutes unconstitutional retaliation.  See *Keenan v. Tejeda*, 290 F.3d 252, 258–59 (5th Cir. 2002); *Colson v. Grohman*, 174 F.3d 498, 511–12 (5th Cir. 1999) (distinguishing actionable retaliation from mere reputational injury).

289.   A reasonable official would have understood that falsely representing that an individual was subject to indictment in order to affect employment would violate clearly established law.

### (c) Targeting Through Association

290.   It was clearly established that retaliation extends to individuals associated with a primary speaker when targeted because of that association.  See *Adler v. Pataki*, 185 F.3d 35, 44–45 (2d Cir. 1999); *Kinney v. Weaver*, 367 F.3d 337, 366–67 (5th Cir. 2004) (en banc)

291.   A reasonable official would have known that targeting a subordinate or associate to punish protected speech is unconstitutional.

### (d) Multi-Step Retaliatory Schemes

292. It was clearly established that retaliation need not occur through a single act and may be carried out through a coordinated sequence of actions.  See *Keenan v. Tejeda*, 290 F.3d 252, 258–59 (5th Cir. 2002).

293. A reasonable official would have understood that combining investigative pressure, false statements, and public dissemination to punish protected speech violates the Constitution.

## F.  Application to Defendants

294. Stewart and Garza are not entitled to qualified immunity because they:

    a.  Acted after receiving direct notice of protected activity;

    b.  Participated in or enabled retaliatory escalation;

    c.  Provided or facilitated dissemination of false information.

295. Louis is not entitled to qualified immunity because she:

    a.  Became involved before formal complaints;

    b.  Used her position to steer investigative processes;

    c.  Participated in actions targeting Caldwell's speech and candidacy.

296. Dickerman is not entitled to qualified immunity because he:

    a.  Used his investigative authority to convey false criminal-status information;

    b.  Did so after the investigation he relied upon had already concluded;

    c.  Caused foreseeable employment harm through that false information.

297.  Tharp and Frazier are not entitled to qualified immunity because they:

    a.  Adopted and republished accusatory materials;

    b.  Did so despite possessing information undermining those materials;

    c.  Used formal channels, including the State Bar of Texas, to amplify harm.

## G. Damages

298.  As a direct and proximate result of Defendants' conduct:

    a.  Caldwell suffered reputational harm, professional injury, emotional distress, and exposure to disciplinary proceedings;

    b.  Olivarez suffered loss of employment, reputational harm, and impairment of his profession.

299.  Defendants' conduct was intentional, knowing, and in reckless disregard of clearly established constitutional rights.

300.  Plaintiffs are entitled to compensatory damages, punitive damages, and all relief available under 42 U.S.C. § 1983.

**COUNT II — FOURTH AMENDMENT VIOLATION (FABRICATION OF EVIDENCE / MALICIOUS PROSECUTION–TYPE CLAIM) (42 U.S.C. § 1983)  (Against All Individual Defendants in Their Individual Capacities)**

301.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

## A.  Nature of the Claim

302.  This claim arises under the Fourth Amendment and is based on Defendants' use of fabricated, misleading, and materially false information to initiate, perpetuate, and give legal effect to criminal accusations against Plaintiffs without probable cause.

303.  Defendants' conduct constituted an unreasonable seizure and deprivation of liberty within the meaning of the Fourth Amendment.

304.  This claim is consistent with and governed by the principles articulated in *Manuel v. City of Joliet*, 580 U.S. 357, 367–69 (2017); *McDonough v. Smith*, 588 U.S. ___, 215–17 (2019); *Thompson v. Clark*, 596 U.S. 36, 42–44 (2022)

## B.  Fabrication and Misuse of Evidence

305.  Defendants knowingly created, used, and disseminated false and misleading information to construct a criminal narrative against Plaintiffs. See also *Cole*

*v. Carson*, 935 F.3d 444, 471–73 (5th Cir. 2019) (en banc) (recognizing fabrication-based constitutional claims under §1983).

306. That conduct included, but was not limited to:

    a. Misrepresenting facts surrounding the June 2023 arrest and related records;

    b. Omitting material exculpatory information from investigative presentations;

    c. Structuring investigative reports to distort the factual sequence and significance of events;

    d. Applying improper analytical standards to portray lawful conduct as criminal;

    e. Creating formal-looking accusatory documents styled as criminal proceedings despite the absence of any indictment or filed case; and

    f. Disseminating false statements that Plaintiffs were the subject of pending criminal prosecution.

307. The fabrication was not limited to isolated inaccuracies.

308. It was systemic, cumulative, and directed toward constructing a coherent but false narrative of criminal conduct.

## C. Application as to Caldwell

309. Defendants used fabricated and misleading information to:

    a.  Initiate and sustain an official-oppression theory against Caldwell;

    b.  Direct investigative resources toward building a criminal case unsupported by probable cause;

    c.  Produce and publish accusatory materials outside judicial process; and

    d.  Expose Caldwell to reputational, legal, and professional consequences equivalent to criminal accusation.

310.  The McCrary documents exemplify this fabrication.

311.  They were styled as "The State of Texas vs. Olivarez" and "The State of Texas vs. Caldwell, Olivarez, and Mercer" despite the absence of any indictment, case filing, or judicial proceeding.

312.  They contained findings and conclusions that went beyond declination and functioned as substitute charging instruments.

313.  Those documents were then disseminated through official channels, civil litigation, and a State Bar grievance.

## D. Application as to Olivarez

314.  Defendants used fabricated and false information to represent that:

    a.  Olivarez was the target of a criminal investigation; and

    b.  A criminal case against him was pending grand-jury indictment in Comal County.

315.  Those representations were made to Bee County law enforcement officials.

316. They were materially false.

317. No indictment existed.

318. No pending criminal case existed.

319. The Bee County Sheriff relied on those representations.

320. As a direct result, Olivarez was forced to resign from his employment on January 17, 2025.

## E.  Lack of Probable Cause

321. Defendants lacked probable cause to initiate or sustain criminal accusations against Plaintiffs.

322. The absence of probable cause is demonstrated by:

   a. The failure to obtain any indictment;

   b. The reliance on fabricated or misleading evidence;

   c. The omission of material exculpatory information;

   d. The internal inconsistencies within Defendants' own representations;

   e. The contradiction between Dickerman's report completion date and his later statements regarding an "ongoing" investigation; and

   f. The inability of Defendants' narrative to withstand ordinary judicial scrutiny.

323. Defendants' conduct therefore violated clearly established law prohibiting the use of fabricated evidence to support criminal charges.

## F.  Seizure and Liberty Deprivation

324. Defendants' actions resulted in a deprivation of Plaintiffs' liberty interests.

325. As to Caldwell, the deprivation included:

    a.  Being subjected to a formal criminal narrative created under color of law;

    b.  Exposure to potential prosecution and legal process;

    c.  Reputational harm combined with formal legal consequences, including Bar proceedings; and

    d.  Restrictions and burdens associated with defending against government-generated accusations.

326. As to Olivarez, the deprivation included:

    a.  Loss of employment;

    b.  Impairment of his ability to work in law enforcement;

    c.  Reputational damage arising from false criminal allegations; and

    d.  Direct consequences resulting from government-created false information.

327. These deprivations were the foreseeable and intended result of Defendants' conduct.

328. As to Plaintiff Caldwell, Defendants' conduct constituted a restraint on liberty sufficient to implicate Fourth Amendment protections notwithstanding the absence of a formal arrest.

329. Defendants, acting under color of law, constructed and disseminated a formal criminal narrative accusing Caldwell of specific criminal conduct, including official oppression and abuse of office, through documents styled and presented as a criminal case.

330. Those documents were not informal commentary or internal memoranda.

331. They were intentionally formatted, structured, and published to function in practice as the equivalent of a charging instrument, despite the absence of any indictment, probable cause determination, or judicial proceeding.

332. Defendants then used those materials to initiate and sustain formal processes against Caldwell, including:

   a. Submission to the State Bar of Texas as purported evidence of criminal misconduct;

   b. Dissemination through civil litigation filings;

   c. Transmission to third-party governmental entities, including the Texas Workforce Commission; and

   d. Reliance upon those materials by decision-makers acting under color of law.

333. As a direct and foreseeable result, Caldwell was subjected to:

  a. Ongoing legal process and compelled defense against government-generated accusations;

  b. Formal exposure to professional discipline;

  c. Government-driven reputational harm coupled with tangible legal consequences; and

  d. Constraints and burdens on his liberty consistent with defending against criminal allegations.

334. Defendants' conduct imposed a restraint on Caldwell's liberty sufficient to constitute a seizure under the Fourth Amendment because it used the machinery of the state to impose legal jeopardy and compel response. See *Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003) (en banc) (addressing limits of Fourth Amendment malicious prosecution claims)

335. At a minimum, Defendants' actions constituted a seizure through legal process by creating and deploying documentation that functioned in practice as the equivalent of proof of criminal conduct without probable cause, arrest, or adjudication.

336. A reasonable official would have understood that manufacturing and publishing a criminal case outside judicial process, and using it to trigger formal legal consequences, violates clearly established Fourth Amendment protections.

337.    Alternatively, independent of any determination under the Fourth Amendment, to the extent a court determines that the conduct described herein does not constitute a seizure within the meaning of the Fourth Amendment, the same conduct constitutes a deprivation of liberty without due process of law under the Fourteenth Amendment, including the imposition of legal consequences and burdens through the use of fabricated or misleading information.

338.    Defendants' conduct, at a minimum, imposed restraints on Plaintiffs' liberty interests through formalized accusations, compelled defense obligations, and direct interference with employment, all arising from the misuse of governmental authority.

## G.  Favorable Termination / Lack of Valid Prosecution

339.    No criminal prosecution supported by probable cause was ever initiated against Plaintiffs.

340.    No indictment was returned.

341.    No criminal case proceeded to adjudication.

342.    Under clearly established law, the absence of a valid prosecution combined with the use of fabricated evidence satisfies the favorable termination requirement. See *Thompson v. Clark*, 596 U.S. 36, 42–44 (2022).

## H. Clearly Established Law

343. At all relevant times, it was clearly established that:

### (a) Fabrication of Evidence

344. Government officials may not fabricate evidence or knowingly use false information to support criminal charges. *See Manuel v. City of Joliet,* 580 U.S. 357, 367–69 (2017)

### (b) Use of Fabricated Evidence in Legal Process

345. The use of fabricated evidence to initiate or continue legal process violates the Fourth Amendment. *See McDonough v. Smith* 588 U.S.___, 215–17 (2019).

### (c) Absence of Probable Cause

346. A prosecution or its functional equivalent unsupported by probable cause violates clearly established constitutional rights.

### (d) Indirect or Constructive Seizure

347. A seizure may occur through legal process, reputational consequences combined with formal action, or employment consequences directly caused by false criminal accusations.

## I. Application to Defendants

348.   Stewart and Garza are not entitled to qualified immunity because they:

   a.   Participated in or facilitated the creation and dissemination of false narratives;

   b.   Acted with knowledge of underlying factual inconsistencies;

   c.   Contributed to the chain of events resulting in fabricated accusations.

349.   Louis is not entitled to qualified immunity because she:

   a.   Directed and influenced the investigative process leading to fabrication;

   b.   Participated in the development of criminal theories unsupported by probable cause;

   c.   Benefited from and reinforced the resulting narrative.

350.   Dickerman is not entitled to qualified immunity because he:

   a.   Provided materially false information regarding Olivarez's criminal status;

   b.   Did so after his investigation had concluded;

   c.   Used his authority to give that false information credibility.

351.   Tharp, McCrary, and Frazier are not entitled to qualified immunity because they:

   a.   Created, adopted, and republished fabricated or misleading accusatory materials;

   b.   Did so despite possessing information undermining those materials;

    c. Used formal governmental channels to give those materials legal effect.

## J. Damages

352. As a direct and proximate result of Defendants' conduct:

    a. Caldwell suffered reputational harm, legal exposure, emotional distress, and professional injury;

    b. Olivarez suffered loss of employment, reputational harm, and impairment of his profession.

353. Defendants' conduct was intentional, knowing, and in reckless disregard of Plaintiffs' constitutional rights.

354. Plaintiffs are entitled to compensatory damages, punitive damages, and all relief available under 42 U.S.C. § 1983.

### COUNT III — FOURTEENTH AMENDMENT (STIGMA-PLUS / REPUTATIONAL DEPRIVATION) (42 U.S.C. § 1983) (Against All Individual Defendants in Their Individual Capacities)

355. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

## A. Nature of the Claim

356. This claim arises under the Fourteenth Amendment and is based on Defendants' publication of false and stigmatizing statements, coupled with tangible alterations of Plaintiffs' legal status and rights.

357. Defendants, acting under color of law, created and disseminated a false criminal narrative portraying Plaintiffs as having engaged in criminal conduct.

358. That narrative was not confined to internal use.

359. It was affirmatively published to third parties and used to trigger concrete legal and professional consequences.

360. This claim is consistent with clearly established law recognizing that reputational harm, when combined with a tangible alteration of status, violates due process. See *Paul v. Davis*, 424 U.S. 693, 701–02 (1976); *Doe v. Covington County School District*, 675 F.3d 849, 860–63 (5th Cir. 2012) (en banc); *Blackburn v. City of Marshall*, 42 F.3d 925, 936–37 (5th Cir. 1995).

**361. B. Stigmatizing Statements**

362. Defendants made and disseminated statements that were false, stigmatizing, and injurious to Plaintiffs' reputations.

363. Those statements included:

a. That Caldwell engaged in criminal conduct, including official oppression and abuse of office;

b. That Caldwell was the subject of a legitimate criminal case;

c. That Olivarez was the subject of a pending criminal investigation and indictment; and

d. That both Plaintiffs engaged in misconduct warranting criminal or disciplinary action.

364. These statements were presented as factual conclusions derived from official investigations.

365. They were not qualified, tentative, or subject to verification.

366. They were definitive, accusatory, and designed to be relied upon.

367. The statements were false.

368. No indictment existed against either Plaintiff.

369. No criminal prosecution supported by probable cause existed.

## C. Publication

370. Defendants published these statements to third parties.

371. Publication was intentional and occurred through multiple channels, including:

    a.  Transmission of the McCrary documents and related materials by Tharp;

    b.  Filing of those materials in a civil lawsuit by Joseph Dubs;

    c.  Submission of those materials to the State Bar of Texas;

    d.  Dissemination to the Texas Workforce Commission;

    e.  Oral and written communications to Bee County officials by Garza and Dickerman; and

    f.  Internal governmental distribution designed to influence decision-makers.

372.  These publications were not incidental.

373.  They were a central objective of Defendants' conduct.

**374.  D.  Falsity and Knowledge**

375.  Defendants knew or should have known that the statements were false.

376.  That knowledge is demonstrated by:

    a.  The absence of any indictment or filed criminal case;

    b.  The limited scope of the special prosecutor appointment;

    c.  The presence of exculpatory information in Defendants' possession;

    d.  Internal inconsistencies in Defendants' own reports and statements; and

    e.  The timing and sequence of events showing pre-determined conclusions.

377. Despite that knowledge, Defendants proceeded to publish the statements as true.

### E. Plus Factor — Tangible Alteration of Legal Status

378. Defendants' stigmatizing statements were accompanied by tangible alterations of Plaintiffs' legal status and rights.

**As to Caldwell:**

379. Defendants' conduct resulted in:

    a. The initiation of formal disciplinary proceedings through the State Bar;

    b. The imposition of legal burdens requiring defense against government-generated accusations;

    c. The use of state authority to create and enforce a formal accusation of criminal conduct; and

    d. The impairment of Caldwell's professional standing and ability to practice law.

380. These consequences were directly tied to the published statements.

381. The publication was the mechanism by which the legal consequences were triggered.

**As to Olivarez:**

382. Defendants' conduct resulted in:

    a. Bee County being informed that Olivarez was pending indictment;

    b. Reliance on that information by Bee County officials;

    c. Olivarez's forced resignation on January 17, 2025; and

    d. The impairment of his ability to obtain future law enforcement employment.

383. These consequences constituted a direct alteration of Olivarez's legal and employment status.

384. The publication of false information was the proximate cause of those consequences.

## F. Causation

385. Defendants' actions were the moving force behind the deprivation of Plaintiffs' rights.

386. The causal chain is direct and unbroken:

    a. Defendants created false and stigmatizing information;

    b. Defendants published that information to decision-makers;

    c. Third parties relied on that information; and

    d. Plaintiffs suffered concrete legal and professional harm.

387. The harm was foreseeable and intended.

## G. Clearly Established Law

388.  At all relevant times, it was clearly established that:

### (a) False Stigmatizing Statements by Government Officials

389.  Government officials may not publicly disseminate false information that seriously damages an individual's reputation in connection with official action.

### (b) Stigma-Plus Requirement

390.  Reputational harm combined with a tangible alteration of legal status violates due process.  *See Paul v. Davis,* 424 U.S. 693, 701–02 (1976).

### (c) Employment and Legal Consequences as "Plus" Factors

391.  Termination of employment, loss of professional opportunities, and initiation of formal proceedings satisfy the "plus" requirement.  *See Doe v. Covington County School District*, 675 F.3d 849, 860–63 (5th Cir. 2012) (en banc)

### (d) Dissemination to Third Parties

392.  It is clearly established that publication to third parties, including other governmental entities, satisfies the publication element.

### H. Application to Defendants

393.  Stewart and Garza are not entitled to qualified immunity because they:

    a.  Participated in or enabled dissemination of false information;

   b.  Provided statements that reinforced the stigmatizing narrative; and

   c.  Acted with knowledge of underlying factual disputes.

394.  Louis is not entitled to qualified immunity because she:

   a.  Directed and influenced the development of the narrative;

   b.  Failed to disclose her prior involvement; and

   c.  Participated in conduct that led to publication and reliance.

395.  Dickerman is not entitled to qualified immunity because he:

   a.  Communicated false criminal-status information to Bee County;

   b.  Did so under color of law and with authority; and

   c.  Caused foreseeable employment consequences.

396.  Tharp, McCrary, and Frazier are not entitled to qualified immunity because they:

   a.  Created, adopted, and transmitted stigmatizing materials;

   b.  Published those materials through formal channels; and

   c.  Caused or substantially contributed to downstream reliance.

397.  Joseph Dubs is not entitled to qualified immunity because he:

   a.  Acted jointly with state actors;

   b.  Published government-generated materials in furtherance of the same narrative; and

   c.  Used those materials to inflict reputational and legal harm.

398. The stigma-plus claim asserted herein is based on the combination of false and stigmatizing statements with concrete alterations of legal status, including employment loss, initiation of disciplinary proceedings, and imposition of legal burdens, and is distinct from the procedural due process violations asserted separately below.

## I.  Damages

399. As a direct and proximate result of Defendants' conduct:

   a. Caldwell suffered reputational injury, professional harm, emotional distress, and legal exposure;

   b. Olivarez suffered loss of employment, reputational harm, and impairment of his profession.

400. Defendants' conduct was intentional, knowing, and in reckless disregard of Plaintiffs' constitutional rights.

401. Plaintiffs are entitled to compensatory damages, punitive damages, and all relief available under 42 U.S.C. § 1983.

### COUNT IV — FOURTEENTH AMENDMENT
### (PROCEDURAL DUE PROCESS) (42 U.S.C. § 1983)
### (Against All Individual Defendants in Their Individual Capacities)

402. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

## A.  Nature of the Claim

403.   This claim is distinct from Plaintiffs' stigma-plus claim and challenges the absence of constitutionally required procedures prior to the deprivation of protected liberty and property interests, including the failure to provide notice and an opportunity to be heard before Defendants created and disseminated accusations of criminal conduct.

404.   This claim arises under the Fourteenth Amendment and is based on Defendants' deprivation of Plaintiffs' protected liberty and property interests without constitutionally adequate process.

405.   Defendants, acting under color of law, imposed formal and informal legal consequences on Plaintiffs by creating and disseminating accusations of criminal conduct without affording notice or any meaningful opportunity to be heard.

406.   The process Defendants employed was not deficient—it was absent.

407.   This claim is grounded in clearly established law requiring notice and an opportunity to be heard before the government imposes stigma coupled with legal consequences.  See *Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 573–74 (1972).

## B.  Protected Interests

408. Plaintiffs possessed protected liberty and property interests, including:

    a. Their reputations in connection with their professions;

    b. Their ability to pursue their chosen occupations;

    c. Their freedom from government-imposed criminal accusations without due process; and

    d. Their interest in not being subjected to formal legal consequences based on false information.

409. These interests are protected when government action both stigmatizes an individual and alters a right or status recognized by law. *See Board of Regents v. Roth* 408 U.S. 564, 573–74 (1972).

## C. Deprivation Without Process

410. Defendants deprived Plaintiffs of these protected interests without providing constitutionally required procedures.

**As to Caldwell:**

411. Defendants created and disseminated a formal criminal narrative accusing Caldwell of criminal conduct.

412. That narrative was embodied in documents styled and presented as a criminal case.

413. Those documents were published and used to initiate formal proceedings, including:

    a. A State Bar grievance;

    b. Civil litigation filings; and

    c. Governmental dissemination to third-party entities.

414. At no point prior to publication was Caldwell:

    a. Provided formal notice of the charges being constructed;

    b. Given an opportunity to respond to the allegations;

    c. Afforded a neutral hearing or review; and

    d. Allowed to challenge the evidence being used against him.

415. Instead, Defendants created the accusation first and provided process, if any, only after the harm had occurred.

416. This reversal of process deprived Caldwell of any meaningful opportunity to be heard.

**As to Olivarez:**

417. Defendants communicated to Bee County that Olivarez was subject to a pending criminal indictment.

418. That statement was false.

419. It was made without any notice to Olivarez.

420. It was made without any opportunity for Olivarez to respond.

421. Bee County relied on that statement and required Olivarez to resign.

422. Olivarez was not afforded:

    a. Notice of the alleged criminal basis for the action;

    b. An opportunity to contest the accuracy of the statement; and

    c. Any pre-deprivation or meaningful post-deprivation process.

423. The deprivation was immediate and final.

## D. Inadequacy of Any Available Process

424. Any post-deprivation process available to Plaintiffs was constitutionally inadequate.

425. The harm was inflicted through official publication and reliance.

426. Once published, the false narrative could not be meaningfully undone.

427. The State Bar process and civil litigation were not substitutes for pre-deprivation due process.

428. Those proceedings were themselves initiated or influenced by the unconstitutional conduct.

429. Under clearly established law, where the government itself creates and disseminates false accusations that trigger legal consequences, pre-deprivation process is required.

430. Defendants deliberately bypassed that requirement.

## E. Clearly Established Law

431. At all relevant times, it was clearly established that:

### (a) Notice and Opportunity to Be Heard

432. The government must provide notice and a meaningful opportunity to be heard before depriving an individual of protected liberty or property interests. *See Mathews v. Eldridge,* 424 U.S. 319, 333–35 (1976).

### (b) Stigma-Plus Requires Process

433. When reputational harm is coupled with alteration of legal status, due process protections apply. *See Board of Regents v. Roth,* 408 U.S. 564, 573–74 (1972).

### (c) Pre-Deprivation Process Requirement

434. Where the deprivation is the result of deliberate government action rather than random conduct, pre-deprivation process is required.

435. A reasonable official would have understood that creating and publishing criminal accusations without providing any opportunity to respond violates clearly established due process rights.

## F. Application to Defendants

436. Stewart and Garza are not entitled to qualified immunity because they:

   a. Participated in the development and dissemination of accusations;

   b. Did so without ensuring any process was provided; and

   c. Acted with knowledge that the information would be relied upon.

437. Louis is not entitled to qualified immunity because she:

   a. Directed and influenced the process by which accusations were developed;

   b. Failed to provide or ensure any procedural safeguards; and

   c. Participated in actions that led directly to deprivation.

438. Dickerman is not entitled to qualified immunity because he:

   a. Communicated false criminal-status information;

   b. Did so without any procedural protections for Olivarez; and

   c. Caused immediate and foreseeable consequences.

439. Tharp, McCrary, and Frazier are not entitled to qualified immunity because they:

a. Created and published accusatory materials;

b. Used formal governmental channels to give those materials effect; and

c. Did so without affording Plaintiffs any opportunity to be heard.

440. Joseph Dubs is not entitled to qualified immunity because he:

a. Acted jointly with state actors;

b. Used the materials to impose additional legal consequences; and

c. Furthered the deprivation without process.

## G. Damages

441. As a direct and proximate result of Defendants' conduct:

a. a. Caldwell suffered reputational harm, legal exposure, emotional distress, and professional injury;

b. b. Olivarez suffered loss of employment, reputational harm, and impairment of his profession.

442. Defendants' conduct was intentional, knowing, and in reckless disregard of Plaintiffs' constitutional rights.

443. Plaintiffs are entitled to compensatory damages, punitive damages, and all relief available under 42 U.S.C. § 1983.

## COUNT V — MUNICIPAL/LOCAL GOVERNMENT LIABILITY (MONELL) (42 U.S.C. § 1983)
### (Against Defendants Wilson County, Texas and Comal County, Texas)

444. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

## A. Nature of the Claim

445. This claim arises under 42 U.S.C. § 1983 and is based on constitutional violations caused by official policy, custom, and decisions of final policymakers for Wilson County and Comal County.

446. The constitutional violations described in Counts I–V were not isolated acts of individual employees.

447. They were the direct result of decisions, ratification, and coordinated conduct attributable to each County through its final policymakers.

448. A municipality is liable under §1983 when a constitutional violation results from:

   a. an official policy;

   b. a widespread custom or practice; or

   c. a decision by a final policymaker.

See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978).

## B. Wilson County Liability

**Final Policymaker — James Stewart**

449. At all relevant times, Defendant James Stewart was the elected Sheriff of Wilson County.

450. As Sheriff, Stewart was the final policymaker for Wilson County with respect to law enforcement operations, personnel conduct, and the handling and dissemination of criminal information.

451. His decisions were not subject to meaningful review within the County.

452. His actions therefore constitute official policy for purposes of §1983 liability.

## C. Policy, Custom, and Practice

453. Wilson County, through Stewart, maintained and enforced policies and customs that led to the violation of Plaintiffs' constitutional rights.

454. These policies and customs included:

    a. Permitting the dissemination of unverified or false criminal information to other agencies;

    b. Allowing senior officials, including Garza, to make representations to third parties without actual authority or by ensuring factual accuracy;

    c. Failing to investigate or correct known inaccuracies once brought to the attention of leadership;

    d.  Encouraging centralized control of communication through the Sheriff to manage and shape narratives; and

    e.  Using official channels to redirect scrutiny away from internal misconduct and toward reporting individuals.

455.  These practices were not isolated.

456.  They were consistent with a broader pattern of handling sensitive information in a manner designed to protect the agency and its personnel.

## D.  Application to Plaintiffs

457.  Stewart was personally informed on June 15 and June 19, 2023, of:

    a.  Record discrepancies that appeared fraudulent;

    b.  Sworn contradictions; and

    c.  Allegations of misconduct involving members of the Sheriff's Office that included the release of official information in unofficial ways or channels.

458.  Despite that knowledge, Stewart:

    a.  Initiated coordination with Louis;

    b.  Failed to take corrective action; and

    c.  Allowed and reinforced the development of a narrative adverse to Plaintiffs.

459.  Stewart further:

a. Centralized communications by ratifying the directive from Garza that directed that all contact with the Sheriff's Office go through him;

b. Participated in or permitted the dissemination of information later shown to be false; and

c. Allowed Garza, acting as his second-in-command, to communicate false information to Bee County.

460. The false representation that Olivarez was subject to a pending indictment was made by a senior official operating under Stewart's authority and within the scope of his duties.

461. That representation directly caused Olivarez's forced resignation.

462. Stewart also participated in or authorized dissemination of the accusatory narrative report from Comal to third parties, including the Texas Workforce Commission.

463. These actions were taken under color of official authority and constitute policy attributable to Wilson County.

**E. Causation**

464. The policies, customs, and decisions of Stewart were the moving force behind the constitutional violations suffered by Plaintiffs.

465. But for Stewart's actions and decisions:

a. False information would not have been disseminated to Bee County;

b. Olivarez would not have been forced to resign; and

c. The narrative used against Caldwell would not have been reinforced at the County level.

## F. Ratification

466. Wilson County, through Stewart, ratified the unconstitutional conduct of subordinates, including Garza.

467. Stewart had actual knowledge of the conduct and its consequences.

468. He approved, adopted, or failed to correct it.

469. That ratification constitutes official policy.

## G. Comal County Liability

**Final Policymaker — Jennifer Tharp**

470. In performing the functions described herein, including the approval, adoption, and dissemination of the accusatory materials at issue, Defendant Tharp acted as a final policymaker for Comal County rather than the State of Texas, because those actions involved discretionary decisions regarding publication, communication, and use of materials outside any prosecutorial

proceeding.  See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *McMillian v. Monroe County*, 520 U.S. 781, 785–86 (1997).

471.  At all relevant times, Defendant Jennifer Tharp acted as the District Attorney for Comal County and as a court-appointed special prosecutor.

472.  In that role, Tharp exercised final decision-making authority regarding:

    a.  Whether to initiate or decline prosecution;

    b.  How investigative findings would be presented; and

    c.  Whether and how accusatory materials would be disseminated.

473.  Her decisions were not subject to meaningful review within Comal County.

474.  Her actions therefore constitute official policy for purposes of §1983 liability.

## H.  Policy and Decision-Based Liability

475.  Comal County is liable because the constitutional violations were caused by decisions made by Tharp as a final policymaker.

476.  Those decisions included:

    a.  not practicing or causing her subordinate to practice and adhere to policies in place related to the confidentiality of investigative materials;

    b.  Accepting and adopting the work of McCrary;

    c.  Authorizing the transmission of the McCrary documents;

    d.  Publishing accusatory materials despite the absence of any indictment;

    e.  Allowing materials to be used in civil litigation and disciplinary proceedings; and

    f.  Initiating and submitting a State Bar grievance based on those materials.

477.  These were not ministerial acts.

478.  They were deliberate policy choices.

## I. Ratification of Subordinate Conduct

479.  Tharp ratified the conduct of McCrary and Frazier.

480.  Tharp had access to information demonstrating that:

    a.  The investigation was limited in scope;

    b.  The documents exceeded that scope; and

    c.  The materials contained conclusions unsupported by formal charges.

481.  Despite that knowledge, Tharp:

    a.  Approved the documents;

    b.  Caused their dissemination; and

    c.  Used them to initiate further proceedings.

482. This ratification constitutes official policy attributable to Comal County. See *Peterson v. City of Fort Worth*, 588 F.3d 838, 847–48 (5th Cir. 2009).

## J.  Custom of Using Non-Judicial Accusatory Materials

483. Comal County, through Tharp, established and implemented a practice of using non-judicial accusatory materials as substitutes for formal criminal process.

484. The McCrary documents were styled and presented as criminal proceedings despite the absence of an indictment or charge by information, any filed case or any judicial oversight.

485. These materials were then disseminated to third parties and used to impose legal consequences.

486. This practice violated clearly established constitutional principles and was the moving force behind Plaintiffs' injuries.

## K.  Causation

487. The actions of Tharp, acting as a final policymaker, were the direct cause of the publication of the McCrary documents; their use in civil litigation and State Bar proceedings; and the formalization and amplification of the false criminal narrative.

488. Without these actions, the constitutional violations would not have occurred.

## L.  Clearly Established Law

489.  At all relevant times, it was clearly established that municipalities are liable for constitutional violations caused by final policymakers.  See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)

490.  It was further clearly established that a single decision by a final policymaker may constitute official policy; the ratification of unconstitutional conduct may establish municipal liability; and the use of official authority to disseminate false accusations violates constitutional rights.

## M.  Damages

491.  As a direct and proximate result of the policies, customs, and decisions of Wilson County and Comal County:

   a.  Caldwell suffered reputational harm, legal exposure, emotional distress, and professional injury; and

   b.  Olivarez suffered loss of employment, reputational harm, and impairment of his profession.

492.  Plaintiffs are entitled to compensatory damages and all relief available under 42 U.S.C. § 1983.

### COUNT VI — DEFAMATION (TEXAS LAW)

**(Against Defendants Jennifer Tharp, Sammy Mark McCrary, and James Stewart in Their Individual Capacities)**

493. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

494. Defendants published statements concerning Plaintiffs that were false, defamatory, and made with at least negligence, and in many instances with actual malice. See *In re Lipsky*, 460 S.W.3d 579, 593–94 (Tex. 2015).

495. As to Plaintiff Caldwell, Defendants Tharp and McCrary created, adopted, and disseminated statements asserting that Caldwell engaged in criminal conduct, including abuse of office and official oppression, through the document styled as a "Non-Prosecution Affidavit" and through subsequent transmissions to third parties, including courts, attorneys, and the State Bar of Texas.

496. These statements were presented as factual conclusions derived from official investigation, were not privileged in their dissemination outside judicial proceedings, and were false in that no indictment, prosecution, or judicial determination of criminal conduct existed.

497. As to Plaintiff Olivarez, Defendant Stewart, acting through himself and his subordinate Garza, and Defendant McCrary through adoption of the

underlying narrative, published or caused to be published statements that Olivarez was the subject of a criminal investigation and pending indictment.

498. These statements were communicated to Bee County officials and others and were false.

499. Defendants knew the statements were false or acted with reckless disregard for their truth or falsity, including by ignoring contradictory information in their possession and by publishing conclusions not supported by any judicial determination.

500. The statements at issue constitute defamation per se under Texas law because they impute criminal conduct and injure Plaintiffs in their professions.

501. The publications were not subject to absolute privilege because they were made outside judicial proceedings and were not necessary to any adjudicative function.

502. To the extent any qualified privilege is asserted, it is defeated by Defendants' actual malice, including knowledge of falsity, reckless disregard for the truth, and the deliberate selection and publication of information designed to create a false impression. See *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646–47 (Tex. 1995).

503.  As a direct and proximate result of Defendants' defamatory statements, Plaintiffs suffered reputational harm, economic damages, mental anguish, and impairment of their professions.

504.  Defendants Tharp, McCrary, and Stewart were each sent requests for correction, clarification, or retraction as required under Texas Civil Practices and Remedies Code § 73.055 in a timely manner.  All Defendants failed to reply as required by law.

505.  Plaintiffs seek all damages available under Texas law, including compensatory damages, presumed damages for defamation per se, and exemplary damages.

### SECTION VIII.   CAUSATION AND RESULTING HARM

506.  The injuries suffered by Plaintiffs were not incidental or speculative. They were the direct and foreseeable result of Defendants' coordinated conduct in creating, shaping, and disseminating accusations of criminal wrongdoing outside of any judicial process.

507.  Defendants did not merely investigate. They generated and published a narrative asserting that Plaintiffs had engaged in criminal conduct, and did so in a manner designed to be relied upon by third parties, including courts, employers, licensing authorities, and members of the public.

508. That publication altered Plaintiffs' legal and professional status. It imposed the functional equivalent of a criminal charge without indictment, without judicial review, and without any opportunity to contest the allegations in an adversarial setting.

509. As a result of Defendants' actions, Plaintiffs suffered concrete and measurable harm, including:

  a. loss of employment opportunities and interference with existing employment relationships;

  b. damage to professional reputation within the legal and law enforcement communities;

  c. impairment of future career prospects; and

  d. exposure to ongoing stigma associated with unadjudicated criminal accusations.

510. For Plaintiff Caldwell, these harms occurred after he left public office and while he was a private citizen, amplifying the impact of Defendants' conduct and removing any justification tied to internal governmental process.

511. For Plaintiff Olivarez, the effects included direct employment consequences following dissemination of the accusations, including actions taken by third parties who relied on Defendants' published materials as credible statements of fact.

512. The connection between Defendants' conduct and Plaintiffs' injuries is not attenuated. The harm flowed directly from the publication and republication of the accusatory materials, including the document labeled "Non-Prosecution Affidavit" and related communications.

513. Defendants knew, or reasonably should have known, that publishing allegations of criminal conduct in this manner—without judicial process and under the authority of government office—would result in precisely the type of reputational, professional, and legal harm Plaintiffs experienced.

514. These injuries constitute the deprivation of protected liberty interests under the Fourteenth Amendment, including the right to pursue one's occupation free from arbitrary governmental stigma, and are actionable under 42 U.S.C. § 1983.

## SECTION IX.  DAMAGES

515. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

516. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered substantial damages.

**A. Damages As To Plaintiff Caldwell**

517. Plaintiff Caldwell has suffered and continues to suffer reputational harm, including damage to his standing in the legal profession and the community.

518. Caldwell has been subjected to formal legal exposure, including State Bar proceedings initiated through the use of Defendants' materials.

519. Caldwell has incurred attorneys' fees and costs associated with defending against government-generated accusations.

520. Caldwell has suffered economic harm, including loss of professional opportunities and impairment of earning capacity.

521. Caldwell has experienced mental anguish, emotional distress, and humiliation as a result of Defendants' actions.

522. These damages were the foreseeable and intended result of Defendants' conduct.

## B. Damages As To Plaintiff Olivarez

523. Plaintiff Olivarez has suffered loss of employment as a direct result of Defendants' conduct.

524. Olivarez has suffered impairment of his ability to obtain future employment in law enforcement.

525. Olivarez has suffered reputational harm within his profession and the community.

526. Olivarez has incurred economic losses, including lost wages, benefits, and future earning capacity.

527. Olivarez has experienced mental anguish, emotional distress, and humiliation.

528. These damages were the direct and foreseeable result of Defendants' false statements and coordinated conduct.

## C. General And Compensatory Damages

529. Plaintiffs seek recovery of all compensatory damages available under 42 U.S.C. § 1983.

530. These include damages for:

    a. Economic loss;

    b. Loss of earning capacity;

    c. Reputational harm;

    d. Emotional distress and mental anguish;

    e. Loss of professional opportunities; and

    f. Costs incurred as a result of Defendants' conduct.

## D. Punitive Damages

531.  Plaintiffs seek punitive damages against all Individual Defendants.

532.  Defendants' conduct was intentional, willful, malicious, and carried out with reckless disregard for Plaintiffs' constitutional rights.

533.  Defendants acted with knowledge of the likely consequences of their actions and proceeded nonetheless.

534.  Punitive damages are necessary to punish Defendants and deter similar conduct.

**E. Attorneys' Fees And Costs**

535.  Plaintiffs seek recovery of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**SECTION X.  JURY DEMAND**

536.  Plaintiffs demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

   a.  Compensatory damages in an amount to be determined at trial;

   b.  Punitive damages against the Individual Defendants;

c.  Declaratory relief that Defendants' conduct violated Plaintiffs' constitutional rights;

d.  Injunctive relief prohibiting further dissemination or reliance upon the false and fabricated materials described herein;

e.  Expungement or retraction of any records or materials created and disseminated in violation of Plaintiffs' rights;

f.  Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

g.  Pre-judgment and post-judgment interest as allowed by law;

h.  Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted this 16th day of April, 2026.

By:  /s/ _____

Tom Caldwell
Attorney in charge for Plaintiffs
Texas Bar No. 24086154
Tom Caldwell Law PLLC
1427 3rd St.
Floresville, Texas 78114
Tel. (210) 355-5874
Fax. (210) 348-3736
Email:  tomcaldlaw@gmail.com